No. 26-1296

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

SIERRA CLUB; CITY OF RIVER ROUGE, MI,

*Intervenors-Plaintiffs-Appellees,*

v.

EES COKE BATTERY, LLC; DTE ENERGY SERVICES, INC.; DTE ENERGY COMPANY; DTE ENERGY RESOURCES, LLC,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Eastern District of Michigan
Hon. Gershwin A. Drain (Case No. 2:22-cv-11191)

## OPENING BRIEF FOR APPELLANTS

Michael P. Hindelang
S. Lee Johnson
HONIGMAN LLP
660 Woodward Ave.
Detroit, MI 48226
Telephone: (313) 465-2506

Molly K. McGinley
HONIGMAN LLP
321 North Clark Street, Suite 500
Chicago, IL 60654
Telephone: (312) 429-6032

Allon Kedem
Dirk Phillips
Brian Williams
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
Telephone: (202) 942-5000
Allon.Kedem@arnoldporter.com

S. Zachary Fayne
ARNOLD & PORTER KAYE SCHOLER LLP
4 Embarcadero Center, 14th Floor
San Francisco, CA 94111-4164
Telephone: (415) 471-3100

*Counsel for Defendants-Appellants*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to 6 Cir. R. 26.1, Appellants EES Coke Battery, LLC; DTE Energy Services, Inc.; DTE Energy Company; and DTE Energy Resources, LLC hereby certify as follows:

1. EES Coke Battery, LLC; DTE Energy Services, Inc.; and DTE Energy Resources, LLC are subsidiaries of DTE Energy Company, a publicly owned corporation.

2. Other than Appellant DTE Energy Company, there is no publicly owned corporation with a financial interest in the outcome.

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ..................................................i

TABLE OF CONTENTS..................................................................... ii

TABLE OF AUTHORITIES .................................................................iv

STATEMENT IN SUPPORT OF ORAL ARGUMENT ..........................................x

INTRODUCTION .............................................................................1

JURISDICTIONAL STATEMENT ..........................................................3

ISSUES PRESENTED FOR REVIEW ......................................................4

STATEMENT OF THE CASE................................................................4

    A.    Legal Background ..............................................................4

    B.    Factual Background..............................................................8

        1.    The EES Coke Facility and U.S. Steel...............................8

        2.    The Coke Battery, the Underfire, and the Flare.........................9

        3.    The 2013 Permit-to-Install ..........................................10

        4.    The 2014 Permit-to-Install ..........................................11

        5.    U.S. Steel's Reduced Demand for COG................................12

        6.    EGLE's Position on Post-Project Emissions ...........................14

    C.    Procedural History..............................................................15

        1.    The Government's Complaint........................................15

        2.    The District Court's Summary Judgment Order.......................15

        3.    The District Court's Bench Trial Decision .............................18

SUMMARY OF ARGUMENT ...............................................................19

STANDARD OF REVIEW ..................................................................23

ARGUMENT ...............................................................................24

I.    THE DISTRICT COURT ERRED IN DETERMINING AS A MATTER OF LAW
THAT EES COKE IS LIABLE UNDER THE CLEAN AIR ACT ..............................24

    A.    Because Removal of the COG Combustion Limit Was Not a
Major Modification, EES Coke Was Not Required to Obtain
NSR Permits ...................................................................24

| | 1. | Removing the COG combustion limit was not a but-for cause of the emissions increase | 26 |
| | 2. | Removing the COG combustion limit was not the proximate cause of the emissions increase | 35 |
| B. | | The Statute of Limitations Bars Recovery of Civil Penalties for Plaintiffs' Modification Claim | 39 |
| | 1. | Section 7475(a) imposes only preconstruction permitting requirements, not ongoing postconstruction requirements | 40 |
| | 2. | The district court erred in holding that a continuing violation exists here | 44 |
| C. | | "Reasonable Possibility" Reporting Was Not Required | 52 |
| II. | | THE PARENT DEFENDANTS ARE NOT THE FACILITY'S "OPERATORS" | 54 |
| A. | | DTEEC Is Not an "Operator" of the Facility | 56 |
| B. | | Neither DTEER Nor DTEES Is an "Operator" of the Facility | 57 |
| III. | | THE DISTRICT COURT ERRED IN AWARDING MONETARY AND INJUNCTIVE RELIEF | 62 |
| A. | | The Civil Penalty Should Have Been Leveled Down, Not Up | 62 |
| B. | | The Concurrent-Remedies Doctrine Bars the Government's Requested Injunctive Relief | 66 |
| C. | | The District Court Exceeded Its Authority in Granting the Sierra Club's Requested Injunctive Relief | 67 |
| CONCLUSION | | | 69 |
| CERTIFICATE OF COMPLIANCE | | | 70 |
| CERTIFICATE OF SERVICE | | | 71 |
| ADDENDUM | | | 72 |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ala. Prof'l Hunters Ass'n v. FAA*,
177 F.3d 1030 (D.C. Cir. 1999) ...................................................................53

*Aluminum Workers Int'l Union, AFL-CIO, Loc. Union No. 215 v. Consol. Aluminum Corp.*,
696 F.2d 437 (6th Cir. 1982) .......................................................................67

*Am. Premier Underwriters, Inc. v. Gen. Elec. Co.*,
14 F.4th 560 (6th Cir. 2021) ...................................................................23, 55

*Atlanta Gas Light Co. v. UGI Utils., Inc.*,
463 F.3d 1201 (11th Cir. 2006) ...............................................................57, 59

*Augustyn v. Wall Twp. Bd. of Educ.*,
139 F.4th 252 (3d Cir. 2025) .......................................................................63

*Betts v. Costco Wholesale Corp.*,
558 F.3d 461 (6th Cir. 2009) .......................................................................63

*Burrage v. United States*,
571 U.S. 204 (2014) .........................................................................24, 26, 35

*CleanCOALition v. TXU Power*,
536 F.3d 469 (5th Cir. 2008) .......................................................................47

*Consol. Edison Co. of N.Y., Inc. v. UGI Utils., Inc.*,
153 F. App'x 749 (2d Cir. 2005) ...................................................................59

*Cope v. Anderson*,
331 U.S. 461 (1947) ....................................................................................66

*Doe v. Burlew*,
165 F.4th 525 (6th Cir. 2026) .......................................................................68

*Ellis v. Gallatin Steel Co.*,
390 F.3d 461 (6th Cir. 2004) ..........................................................................4

*Engebretsen v. Fairchild Aircraft Corp.*,
21 F. 3d 721 (6th Cir. 1994) ...................................................................60

*F.C.C. v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012)..................................................................................53

*Fish Farms P'ship v. Winston-Weaver Co.*,
531 Fed. App's 711 (6th Cir. 2013)...........................................................60

*Koon v. United States*,
518 U.S. 81 (1996).....................................................................................63

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014)....................................................35, 36, 37, 38, 57

*McLean v. 988011 Ontario, Ltd.*,
224 F.3d 797 (6th Cir. 2000) ...................................................................34

*N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp.*,
766 F.3d 212 (2d Cir. 2014) .....................................................................61

*Nat'l Parks Conservation Ass'n, Inc. v. Tennessee Valley Auth.*,
480 F.3d 410 (6th Cir. 2007) ........................................ 39, 48, 49, 50, 51

*Nat'l Parks & Conservation Ass'n v. Tennessee Valley Auth.*,
502 F.3d 1316 (11th Cir. 2007) ..................................... 39, 44, 45, 47, 50, 51, 67

*PHH Corp. v. CFPB*,
839 F.3d 1 (D.C. Cir. 2016)................................................................53, 54

*Pound v. Airosol Co., Inc.*,
498 F.3d 1089 (10th Cir. 2007) ..........................................................62, 63, 65

*Raytheon Constructors, Inc. v. Asarco Inc.*,
368 F.3d 1214 (10th Cir. 2003) ...........................................................57, 59

*Rocheleau v. Elder Living Constr., LLC*,
814 F.3d 398 (6th Cir. 2016) ...................................................................23

*Russello v. United States*,
464 U.S. 16 (1983).....................................................................................43

*Shangrila P'ship v. Lemos*,
  No. 25-1495, 2025 WL 3245076 (6th Cir. Nov. 20, 2025) ................................67

*Sharpe v. Cureton*,
  319 F.3d 259 (6th Cir. 2003) ...............................................................68

*Sierra Club v. Khanjee Holding (US), Inc.*,
  655 F.3d 699 (7th Cir. 2011) ...............................................................66

*Sierra Club v. Korleski*,
  681 F.3d 342 (6th Cir. 2012) ..................................................................5

*Sierra Club v. Oklahoma Gas & Elec. Co.*,
  816 F.3d. 666 (10th Cir. 2016) .............................................44, 66, 67

*Sierra Club v. Otter Tail Power Co.*,
  615 F.3d 1008 (8th Cir. 2010) ............................ 42, 44, 45, 50, 66, 67

*Summit Petroleum Corp. v. U.S. E.P.A.*,
  690 F.3d 733 (6th Cir. 2012) ...............................................................43

*Tenn. Clean Water Network v. Tenn. Valley Auth.*,
  905 F.3d 436 (6th Cir. 2018) ...............................................................67

*Trump v. CASA, Inc.*,
  606 U.S. 831 (2025)...................................................................67, 68

*United States v. Anthony Dell'Aquilla, Enters. & Subsidiaries*,
  150 F.3d 329 (3d Cir. 1998) ...........................................................54, 65

*United States v. Bestfoods*,
  524 U.S. 51 (1998)................................ 54, 55, 56, 57, 58, 59, 60, 61

*United States v. Cinergy Corp.*,
  618 F. Supp. 2d 942 (S.D. Ind. 2009).................................................35

*United States v. Cinergy Corp.*,
  623 F.3d 455 (7th Cir. 2010) ...............................................................35

*United States v. DTE Energy Co.*,
  711 F.3d 643 (6th Cir. 2013) ....................................6, 7, 8, 24, 51, 52

*United States v. EME Homer City Generation, L.P.*,
727 F.3d 274 (3d Cir. 2013) ................................................ 39, 40, 42, 43, 47, 50

*United States v. Luminant Generation Co., L.L.C.*,
905 F.3d 874 (5th Cir. 2018) ................................................41, 42, 44, 47

*United States v. Luminant Generation Co., L.L.C.*,
929 F.3d 316 (5th Cir. 2019) ................................................41

*United States v. Midwest Generation, LLC*,
694 F. Supp. 2d 999 (N.D. Ill. 2010) .................................... 41-42

*United States v. Midwest Generation, LLC*,
720 F.3d 644 (7th Cir. 2013) ................................................42, 44, 45, 50, 52

*United States v. Midwest Suspension & Brake*,
824 F. Supp. 713 (E.D. Mich. 1993) ....................................63

*United States v. Midwest Suspension & Brake*,
49 F.3d 1197 (6th Cir. 1995) ................................................63

*United States ex rel. Martin v. Hathaway*,
63 F.4th 1043 (6th Cir. 2023) ................................................26, 38

## Constitutonal Provisions and Statutes

U.S. Const., amend. V ................................................53

28 U.S.C.
  § 1291 ................................................3
  § 1331 ................................................3
  § 1345 ................................................3
  § 1355 ................................................3
  § 2462 ................................................39

42 U.S.C.

§ 7401 *et seq.* ...................................................................... 1, 4, 18, 19, 51, 64

§ 7401(b)(1) ........................................................................................4

§ 7407(d) ............................................................................................5

§ 7409 .................................................................................................4

§ 7410(a)(1) ........................................................................................5

§ 7413(b) .......................................................................................3, 54

§ 7413(e)(1) ................................................................................63, 65

§ 7470 .................................................................................................5

§ 7471 .................................................................................................5

§ 7472 .................................................................................................5

§ 7473 .................................................................................................5

§ 7474 ..................................................................................................

§ 7475 ...........................................................................5, 40, 44, 52

§ 7475(a) ...................... 39, 40, 41, 42, 43, 44, 45, 48, 67

§ 7475(a)(1) .....................................................................................41

§ 7475(a)(3) .....................................................................................41

§ 7475(a)(4) ...............................................................................41, 45

§ 7475(a)(6) .....................................................................................41

§ 7476 .................................................................................................5

§ 7477 ...........................................................................................3, 5

§ 7478 .................................................................................................5

§ 7479 .................................................................................................5

§ 7479(2)(C) ....................................................................................41

§ 7479(3) ..........................................................................................45

§ 7501 .................................................................................................5

§ 7661a(a) .......................................................................................43

## Regulations & Rules

78 Fed. Reg. 47,191 (Aug. 5, 2013).............................................5

78 Fed. Reg. 53,272 (Aug. 29, 2013) .........................................5

30 Texas Admin. Code § 116.111(a)(2)(C) .............................47

Mich. Admin. Code R.

    336.2801(aa)(i)............................................................................6

    336.2801(b)(ii) ...........................................................................6

    336.2801(f)................................................................................47

    336.2801(ll)(ii)(C) ......................................................................7

    336.2801(qq)..............................................................................6

    336.2802(3)..............................................................................46

    336.2802(4)(b) ...........................................................................7

    336.2802(4)(c) ...........................................................................6

    336.2810(3)..........................................................................46, 50

    336.2818(3)...............................................................................7

    336.2901(b)(ii) ......................................................................6-7, 29

    336.2901(ee)(ii)(C) .....................................................................7

    336.2901(hh)..............................................................................6

    336.2901(t)(i)............................................................................6

    336.2902(2)(b) ....................................................................7, 24, 31

    336.2902(2)(c) .......................................................................6, 31

    336.2902(6)..........................................................................8, 53

Tenn. Comp. R. & Regs.

    § 1200-3-9-.01(1)(e).....................................................................49

    § 1200-3-9-.01(4)(a)(5)..................................................................50

    § 1200-3-9-.01(4)(j)(3)..................................................................50

# STATEMENT IN SUPPORT OF ORAL ARGUMENT

Pursuant to Fed. R. App. R. 34(a) and 6 Cir. R. 34(a), Appellants EES Coke Battery, LLC; DTE Energy Services, Inc.; DTE Energy Company; and DTE Energy Resources, LLC respectfully request oral argument. The district court's summary judgment and bench trial decisions and the record on appeal involve multiple issues, the resolution of which requires consideration of an extensive factual record and presents significant legal questions. Some of these issues present questions of first impression in this Circuit, including the appropriate causation standard in Clean Air Act cases. Appellants further state that the district court's ruling on the statute of limitations deviates from every court of appeals that has considered this issue. Appellants submit that oral argument will significantly aid the Court's decisional process.

**INTRODUCTION**

The district court imposed a $100 million civil penalty—the largest ever assessed against a stationary source in the 63-year history of the Clean Air Act (the Act)—and sweeping injunctive relief. It did so based on a mistaken premise: that Defendants-Appellants failed to obtain required permits for an emissions increase that they supposedly caused at their coke plant (the Facility). The record shows otherwise. Defendants obtained and complied with the permits required by the state regulator that administers the Act in Michigan. And at every step, the regulator determined that no further permits were required. The ruling below, which resolved the parties' central factual dispute about causation as a matter of law, is flawed on multiple independent grounds. This Court should reverse.

The Act's New Source Review (NSR) program is triggered only when a source undertakes a "major modification"—that is, a change that *causes* a significant emissions increase. This case thus turns on a straightforward question: What caused the increase in emissions at the Facility? The government alleges that an operational change at the Facility—to remove a limit on how much coke oven gas the Facility could burn as fuel to produce coke, rather than through unproductive "flaring"—caused the emissions increase. Not so. At most, the change affected only *where* the emissions occurred within the Facility's emissions unit, not *how much* was emitted.

Instead, the emissions increase resulted from the unexpected decision of a third-party, U.S. Steel, to sharply curtail its purchases of the Facility's excess coke oven gas. U.S. Steel's decision forced the Facility to burn on-site gas that it had historically sold. That independent market event—unforeseeable, external, and wholly beyond Defendants' control—breaks any chain of causation as a matter of law. The district court's contrary conclusion disregards both but-for and proximate causation, and improperly resolves key factual disputes at summary judgment.

Even if the government could establish causation as a matter of law (it cannot), its claim fails for an independent reason: It is time-barred. The statutory provision at issue imposes *pre*construction permitting obligations, not ongoing operational requirements. Any alleged violation therefore must have occurred—if at all—when the Facility changed its method of operation in 2013. Because the government did not bring suit until years after the applicable five-year statute of limitations had expired, its claim is untimely. Every court of appeals to consider this question has reached the same conclusion, and no authority supports the district court's "continuing violation" theory.

The district court compounded these threshold errors with additional missteps. It imposed liability on Defendants for failing to submit "reasonable possibility" reports, even though the state regulator expressly instructed Defendants that such reports *were not* required, violating basic principles of fair notice. It disregarded

settled corporate-law principles, holding three parent entities liable as "operators" despite the absence of *any* evidence to overcome the established presumption that dual-hat officers act on behalf of the subsidiary, not the parent. And it imposed unprecedented monetary and injunctive relief based on legally flawed reasoning, including a penalty calculation wholly untethered from the relevant statutory factors, as well as legislative-style equitable relief granted in favor of non-parties.

The result is a judgment that cannot be reconciled with the Act, governing precedent, or fundamental principles of fairness. Each of the district court's errors independently warrants reversal. Taken together, they amount to an unprecedented and far-reaching decision that departs from the statute at every critical step—from liability, to limitations, to remedy. This Court should reverse.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331, 1345, and 1355, and the Act, 42 U.S.C. §§ 7413(b), 7477. On February 24, 2026, the court entered final judgment against Defendants. Judgment, RE.412, PageID#28659. Defendants timely appealed. Notice of Appeal, RE.418, PageID#28718. This Court has jurisdiction under 28 U.S.C. § 1291.

**ISSUES PRESENTED FOR REVIEW**

1.   Whether the district court erred in holding, as a matter of law, that EES Coke violated the Act. Specifically:

     a.   Whether the record is undisputed that the project constitutes a major modification, such that EES Coke was required to obtain NSR permits.

     b.   Whether the government's NSR permitting claim alleges a "continuing violation," such that it satisfies the applicable statute of limitations.

     c.   Whether EES Coke was required to submit "reasonable possibility" reports, even though EGLE told it such reports were not required.

2.   Whether the district court erred in holding that EES Coke's corporate parents are "operators" of the Facility under the Act.

3.   Whether the district court erred in awarding $100 million in civil penalties and imposing significant injunctive relief that extended to thousands of parties not before the court.

**STATEMENT OF THE CASE**

**A.   Legal Background**

The Clean Air Act, 42 U.S.C. § 7401 *et seq.*, establishes a federal regulatory framework "to protect and enhance the quality of the Nation's air resources." *Id.* § 7401(b)(1). The Act employs "a model of cooperative federalism" between the U.S. Environmental Protection Agency (EPA) and the States. *Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 467 (6th Cir. 2004). EPA sets National Ambient Air Quality

Standards for certain pollutants, 42 U.S.C. § 7409, including sulfur dioxide ($SO_2$) and fine particulate matter ($PM_{2.5}$). Each State must then develop a "state implementation plan" (SIP) "provid[ing] for implementation, maintenance, and enforcement" of the ambient standards. *Id.* § 7410(a)(1). Once EPA approves, a SIP "is added to the Code of Federal Regulations and becomes federal law." *Sierra Club v. Korleski*, 681 F.3d 342, 343 (6th Cir. 2012). The Michigan Department of Environment, Great Lakes, and Energy (EGLE) develops and implements Michigan's SIP.

The Act requires each State to designate areas where air quality is either attaining or not attaining the standards for each pollutant. 42 U.S.C. § 7407(d). When EPA initiated this suit, Wayne County, Michigan—where the Facility is located—was classified as nonattainment for $SO_2$ and attainment for $PM_{2.5}$. *See* 78 Fed. Reg. 47,191 (Aug. 5, 2013); 78 Fed. Reg. 53,272 (Aug. 29, 2013).

A key component of the Act is the NSR program, which prohibits construction of new major sources of air pollution without obtaining an NSR permit. 42 U.S.C. §§ 7470-7515.[1] But "sources already in existence when the program was

---

[1] NSR consists of Prevention of Significant Deterioration (PSD) and Non-Attainment New Source Review (NNSR) provisions. PSD applies to attainment areas and requires emission limits based on installation of "best available control technology" or "BACT." 42 U.S.C. §§ 7470-7479; Mich. Admin. Code R. 336, Part 18. NNSR applies to nonattainment areas and requires installation of pollution controls to comply with the "lowest achievable emission rate" or "LAER." 42 U.S.C. §§ 7501-7515; Mich. Admin. Code R. 336, Part 19.

implemented"—like the Facility here—"do not have to obtain a permit unless and until" they undergo a "major modification." *United States v. DTE Energy Co.*, 711 F.3d 643, 645 (6th Cir. 2013).

A major modification is "[a]ny physical change in or change in the method of operation of a major stationary source that would result in … (A) [a] significant emissions increase of a regulated [NSR] pollutant," and "(B) [a] significant net emissions increase of that pollutant from the major stationary source." Mich. Admin. Code R. 336.2801(aa)(i), 336.2901(t)(i). A "significant emissions increase" is defined as 40 tons per year for $SO_2$ and 10 tons per year for $PM_{2.5}$. Mich. Admin. Code R. 336.2801(qq), 336.2901(hh).

For proposed modifications that involve only existing emissions units, as here, the "actual-to-projected-actual" test applies to determine whether the modification will result in a significant emissions increase. Mich. Admin. Code R. 336.2802(4)(c), 336.2902(2)(c). Under this test, a significant emissions increase is projected to occur if the "sum of the difference between the projected actual emissions and the baseline actual emissions for each existing emissions unit equals or exceeds the significant amount for that pollutant." *Id.* "Baseline actual emissions," in turn, is defined as the "average rate, in tons per year, at which the emissions unit actually emitted the pollutant during *any* consecutive 24-month period *selected by*

*the owner or operator* within the 10-year period immediately preceding" the change. Mich. Admin. Code R. 336.2801(b)(ii), 336.2901(b)(ii) (emphases added).

Importantly, to qualify as a major modification, the physical change or change in the method of operation "must be *the cause* of the emissions increase." *DTE*, 711 F.3d at 646 (emphasis added). For that reason, facilities may "exclude from their calculations any increase in emissions caused by an independent factor." *Id.*; *see* Mich. Admin. Code R. 336.2801(ll)(ii)(C), 336.2901(ee)(ii)(C) (facilities may exclude from projected actual emissions "that portion of the unit's emissions following the project that an existing unit could have accommodated during the [baseline period] and that are also unrelated to the particular project, including any increased utilization due to product demand growth"). This has been dubbed the "demand growth exclusion," since an increase in market demand is the most common independent factor warranting exclusion, but exclusions are not limited to that specific scenario. *DTE*, 711 F.3d at 646.

Although NSR is a preconstruction permitting program, a facility's pre-change projections are not dispositive. The regulations provide that "[r]egardless of any such preconstruction projections, a major modification results if the project causes a significant emissions increase and a significant net emissions increase." Mich. Admin. Code R. 336.2802(4)(b), 336.2902(2)(b). The regulations also impose monitoring and reporting requirements when there is a "reasonable possibility" that

the change, though not a major modification at the time of implementation, may result in a significant emissions increase. Mich. Admin. Code R. 336.2818(3), 336.2902(6). Together, these provisions "ensure that the operators [do] not deliberately underestimate emissions to avoid the permit requirement." *DTE*, 711 F.3d at 645-46.

### B. Factual Background

#### 1. The EES Coke Facility and U.S. Steel

EES Coke operates a coke battery located on Zug Island in River Rouge, Michigan. 2014 Permit Application, RE.168-9, PageID#9418. The Facility produces coke—a hard, carbon-rich material derived from coal. *See* Fanning Decl., RE.168-4, PageID#9320. Coke is essential to the steel-manufacturing industry, which generates more than $500 billion in total economic impact annually and employs nearly two million Americans. *Id.* Yet there remain fewer than a dozen coke batteries in the entire United States. *Id.*

For decades, the Facility produced coke alongside a steel-manufacturing plant. *Id.* PageID#9317-20. The two facilities are located side-by-side on Zug Island and were originally developed together, with National Steel Corporation overseeing

coke-making and steel production. *Id.*[2] EES Coke began operating the Facility in 2004, while the steel mill eventually came to be operated by U.S. Steel. *Id.*

### 2. The Coke Battery, the Underfire, and the Flare

EES Coke's Facility consists of 85 ovens that operate continuously. 2014 Permit Application, RE.168-9, PageID#9419-20. To produce coke, coal is loaded into the ovens, heated to approximately 1,800-2,200°F, and converted into coke. *Id.* PageID#9419.

The heating mechanism needed to produce coke is known as the "underfire." Fanning Decl., RE.168-4, PageID#9320. EES Coke can use various gases to fuel the underfire, including coke oven gas (COG), blast furnace gas (BFG), and natural gas. *Id.* PageID#9324-25. Regardless of which fuel is used, the coking process generates COG as a byproduct from heating coal, and the subsequent combustion of COG is the Facility's primary source of $SO_2$ and $PM_{2.5}$ emissions. 2014 Permit Application, RE.168-9, PageID#9425.

While EES Coke can reuse some COG to fuel the underfire, the Facility generates more COG than it can productively use. Fanning Decl., RE.168-4, PageID#9322. EES Coke's preferred option is to sell the excess COG to U.S. Steel or other offsite facilities. *Id.* And for decades, that is what EES Coke did: From 2004

---

[2] EGLE has consistently regulated the Facility and the steel-making plant as a single stationary source.

to 2014, EES Coke sold U.S. Steel, on average, roughly 4,000,000 MMBtu of COG per year. *Id.* PageID#9328-32; EES Coke's Resp. to EGLE, RE.168-6, PageID#9367.

The remaining COG that EES Coke cannot use or sell must be burned at the "flare"—a safety device used to combust excess gas in an environmentally approved way. Fanning Decl., RE.168-4, PageID#9322. Burning COG generates the same level of $SO_2$ and $PM_{2.5}$ emissions whether it occurs at the underfire or the flare. 2014 Permit Application, RE.168-9, PageID#9420, 9430.

Together, the underfire and flare make up the Facility's "emissions unit." 2014 Permit, RE.168-8, PageID#9377. Crucially for this dispute, given that any COG not burned at the underfire or sold must be flared, any net increase in COG burned at the underfire or sold necessarily results in a corresponding decrease in COG that must be flared. Fanning Decl., RE.168-4, PageID#9325-29. Conversely, any net decrease in COG burned at the underfire or sold necessarily results in a corresponding increase in COG that must be flared. *Id.*

### 3. The 2013 Permit-to-Install

Historically, EES Coke used a mixture of BFG and COG to fuel the underfire. *Id.* PageID#9324. But EES Coke discovered that using BFG was damaging the battery's ovens and continued use could permanently disable the battery. *Id.* PageID#9324-25. To avoid premature failure of the battery, EES Coke stopped using BFG entirely by August 2012 and switched to fueling the underfire exclusively

10

with COG. EGLE Memo, RE.168-16, PageID#9888. To facilitate this switch, in May 2013, EES Coke submitted a permit application to EGLE requesting temporary removal of the limits on how much COG it could burn at the underfire. *See* 2013 Permit Application, RE.168-10, PageID#9631, 9640. In November 2013, EGLE issued the permit. 2014 Permit Application, RE.168-9, PageID#9418.

### 4. The 2014 Permit-to-Install

In June 2014, EES Coke submitted a permit application to EGLE for approval of several changes to EES Coke's operation of the Facility. *Id.* PageID#9412. Most relevant here, EES Coke sought to make permanent the temporary removal of the limits on underfire COG combustion so it could continue to fuel the underfire exclusively with COG. *Id.* PageID#9421. EES Coke also sought an increase of the annual coal throughput limit and, relatedly, an increase in the annual $SO_2$ limit at the underfire from 2,033 to 2,072 tons per year. *Id.* PageID#9421-22.

As part of the permit application, EES Coke's consultant conducted an NSR applicability analysis to determine whether the proposed changes would constitute a "major modification." *Id.* PageID#9447. Based on this analysis, EES Coke concluded—and EGLE agreed—that the proposed changes would not cause a significant emissions increase of $SO_2$ or $PM_{2.5}$ and thus would not constitute a major modification for those pollutants. *Id.* PageID#9446.

11

EGLE approved the permit application on November 21, 2014. MSJ Op., RE.331, PageID#24333. EPA had an opportunity to review the permit application and did not object. Blathras Dep., RE.168-13, PageID#9865-68.

### 5. U.S. Steel's Reduced Demand for COG

For decades, EES Coke sold substantial amounts of COG that it generated, but could not productively use, to its neighbor U.S. Steel. Fanning Decl., RE.168-4, PageID#9323. But that changed in January 2016 when U.S. Steel dramatically reduced the amount of COG it purchased from EES Coke. *Id.* PageID#9330. From 2015 to 2016, U.S. Steel essentially cut its purchases in half:



*Id.*

U.S. Steel's sudden drop in demand for COG meant that EES Coke had to flare what it otherwise would have sold. *Id.* PageID#9330. This led to an increase in

$SO_2$ emissions from the flare, which caused the coke battery Facility's overall emissions to increase:



*See* App. 55-69. As shown above, of the total COG generated by the coke battery Facility, the proportion burned at the flare increased steadily in the wake of U.S. Steel's reduction in COG purchases, while the proportion burned at the underfire remained relatively constant.

Notably, the increase in the coke battery Facility's emissions *did not* result in a net increase in $SO_2$ emissions to the neighboring communities; it merely shifted them from one plant on Zug Island (U.S. Steel) to the other (EES Coke). In fact, taken together, U.S. Steel's and EES Coke's combined $SO_2$ emissions were generally *lower* after EES Coke's operational change than before:

13



Chart, RE.318-3, PageID#23939; App. 72-73.

### 6. EGLE's Position on Post-Project Emissions

In June 2022, *after* EPA initiated this lawsuit, EGLE separately analyzed EPA's allegations and concluded EES Coke did *not* violate the 2014 Permit or the Act. *See* App. 74-85; Trial Tr., RE.391, PageID#27369-72. EGLE "d[id] not agree with USEPA that these exceedances are automatic violations of the [Act] and Michigan's [SIP]" because the emissions "did not exceed emission limits in [the 2014 Permit]; *and there were legitimate reasons unrelated to the project that caused higher than anticipated emissions.*" App. 76 (emphasis added). EGLE further concluded that "the emissions from the actual to projected actual analysis were less

14

than 50% of significance levels and did not require an annual recordkeeping provision be included in the permit (known as reasonable possibility)." *Id.*

## C. Procedural History

### 1. The Government's Complaint

The United States filed this action on June 1, 2022. *See* Compl., RE.1, PageID#1-22. The government asserted two claims. First, it alleged EES Coke undertook a major modification of the Facility without obtaining NNSR (for $SO_2$) or PSD (for $PM_{2.5}$) permits in violation of the Act and Michigan's SIP. *Id.* PageID#17-18. Second, it alleged EES Coke further violated Michigan's SIP by failing to submit "reasonable possibility" reports following the alleged major modification. *Id.* PageID#19-20.

The government later amended its Complaint to add DTE Energy Resources, LLC (DTEER); DTE Energy Services, Inc. (DTEES); and DTE Energy Company (DTEEC) as joint defendants. Am. Compl., RE.91, PageID#3811. The government alleged that, in addition to EES Coke, these parent entities were *also* the Facility's "operators." *Id.* PageID#3814-15. Sierra Club and the City of River Rouge intervened. Intervenors' Order, RE.38, PageID#2641-43.

### 2. The District Court's Summary Judgment Order

Following discovery, the parties sought summary judgment on liability. MSJ Op., RE.331, PageID#24325-26. In August 2025, the district court granted the

government's motion for partial summary judgment as to liability against EES Coke and denied Defendants' motions. *Id.*

The district court devoted just three paragraphs to the key issue in the case: whether EES Coke's operational change caused a significant emissions increase and thus constituted a major modification. *Id.* PageID#24343-47. The court recognized that, to constitute a major modification, an operational change must cause the significant emissions increase in question. *Id.* PageID#24328, 24330. But it never elucidated the applicable causation standard, instead concluding—without citation to any rule or caselaw—that the government made the requisite showing because removal of the COG combustion limit was a "but for" cause of the emissions increase. *Id.* PageID#24347. In the court's view, because the 2014 Permit "allowed" EES Coke to burn more COG at the underfire, and EES Coke ultimately did so, the permit *caused* the significant emissions increase. *Id.* PageID#24346.

The district court rejected EES Coke's argument that it was U.S. Steel's sudden drop in COG purchases that caused the emissions increase. *Id.* PageID#24345-47. While the court conceded U.S. Steel's drop in demand "might explain *why* EES Coke burned more" COG, in its view that did not "change the fact that, but for the 2014 Permit, EES Coke could not have legally burned COG at underfire in excess of the prior COG limit." *Id.* PageID#24346-47.

The district court likewise summarily rejected EES Coke's statute-of-limitations argument. *Id.* PageID#24353-55. The court reiterated a prior ruling that EES Coke's argument was precluded by Sixth Circuit caselaw purportedly holding that EES Coke's failure to obtain NSR permits was a "continuing violation," and that, alternatively, the government's claims did not begin to accrue until 2018—five years after the project. *Id.* PageID#24354.

On the second liability question, the district court concluded EES Coke violated NSR's "reasonable possibility" reporting requirements. *Id.* PageID#24350-52. The court determined that, in light of the emissions increases it identified, EES Coke was required to report emissions under applicable regulations. *Id.* It reached this conclusion despite recognizing that EGLE—the regulatory agency to which EES Coke was purportedly required to submit the report—"represented [to EES Coke] that such reporting was not required." *Id.* PageID#24352.

Finally, the district court addressed whether EES Coke's parent entities could be held jointly liable as "operators" under the Act. *Id.* PageID#24355. The court determined that genuine disputes of material fact existed regarding the extent of the parent entities' control of the Facility and therefore denied summary judgment, leaving operator liability to be resolved at trial. *Id.* PageID#24355-6.

### 3. The District Court's Bench Trial Decision

The issues presented at trial were: (1) whether EES Coke's parent entities could be held liable as "operators" of the Facility; and (2) the appropriate remedy for EES Coke's violations of the Act. Trial Order, RE.410, PageID#28608. The district court conducted a bench trial in September 2025. *Id.*

In February 2026, the district court issued its findings of fact and conclusions of law. On operator liability, the court held all three parent entities were "operators" of the Facility under the Act, concluding they exercised sufficient control over operations, including environmental decision-making and capital expenditures. *Id.* PageID#28608-09.

As for remedies, the district court imposed substantial monetary and equitable relief. In calculating a $100 million civil penalty, the court used the so-called "bottom up" approach, which requires first determining "the economic benefit a violator gained by noncompliance" and then adjusting that number up or down based on various statutory factors. *Id.* PageID#28635. Relying on testimony from the government's expert witness, the court concluded EES Coke's economic benefit of noncompliance was $70 million. *Id.* PageID#28637. The court then applied a 1.5 multiplier "[t]o ensure the civil penalty levels the economic playing field and adequately deters future Clean Air Act violations," bringing the penalty to $105 million. *Id.* Finally, the court reduced the penalty by $5 million due to "Defendants'

good faith efforts to comply" and because "Defendants earnestly believed their excess emissions were lawful under the 2014 Permit." *Id.* PageID#28638.

The district court also imposed a $1 civil penalty for EES Coke's violations of the "reasonable possibility" reporting requirements. *Id.*

On top of the civil penalties, the district court awarded the government and Sierra Club extensive injunctive relief. Per the government's request, the court ordered EES Coke to come into compliance with the Act by applying for and obtaining the requisite NSR permits. *Id.* PageID#28640-41. The court also granted broad equitable relief sought by Sierra Club, ordering EES Coke to establish a "Community Quality Action Committee"; to convene the committee no less than once per quarter for the first three years; and to fund at least $20 million worth of projects over seven years. *Id.* PageID#28653-54. Those projects, the court posited, could include such varied endeavors as funding for air purifier devices and "home weatherization." *Id.* PageID#28654.

## SUMMARY OF ARGUMENT

**I.** EES Coke is not liable under the Act—either for failing to obtain NSR permits or for failing to submit "reasonable possibility" reports.

**A.** Whether EES Coke was required to obtain NSR permits turns on whether the Facility underwent a major modification, meaning a change in operation that *caused* a significant emissions increase. That inquiry has two parts: actual (but-

for) causation and proximate causation. The dispositive question is whether that change in operation—removal of a limit on how much COG EES Coke could burn at the underfire—was both the but-for and proximate cause of a significant emissions increase. The record shows that it was neither, and the district court erred in resolving this central dispute in the government's favor at summary judgment.

To establish that the change was a but-for cause of the emissions increase, the government needed to show that, absent the change, the emissions increase would not have happened. But it cannot make that showing because, even if EGLE had denied EES Coke's 2013 and 2014 permit applications, the emissions would have increased just the same. The only difference would have been that the increased emissions would have moved from one component of the emissions unit (the underfire) to another (the flare). Among the district court's errors, the most fundamental was in limiting its analysis to only half the emissions unit, even though the governing regulations required the court to consider the emissions unit as a whole.

Even if the government could clear that hurdle, it cannot establish that removal of the underfire COG combustion limit was the *proximate* cause of the emissions increase that occurred five years *after* the limit was removed. That is because an unforeseen, superseding market event severs any causal connection. What actually caused the Facility's emissions to increase was U.S. Steel's sudden

decrease in how much COG it purchased from EES Coke, which forced EES Coke to begin flaring significantly more COG than it anticipated.

**B.** The NSR claim is also barred by the applicable statute of limitations. The Act prohibits only constructing or modifying a facility without meeting NSR requirements, not *operating* a facility without a permit. As all six Circuits to consider the issue have held, NSR violations occur at the time of modification, not on a "continuing" basis. Here, the purported major modification was implemented in December 2013, when EES Coke increased COG combustion at the underfire, but the parties did not enter a tolling agreement until September 2019—outside the five-year statute of limitations.

**C.** EES Coke did not violate the Michigan SIP by failing to submit "reasonable possibility" reports. EES Coke did not submit those reports for the simple reason that EGLE *told* EES Coke the reports *were not* required. Under fundamental principles of fairness, the government cannot penalize EES Coke for relying on EGLE's guidance.

**II.** The district court erred in treating EES Coke's parent entities as the Facility's "operators."

**A.** DTEEC had nothing to do with management of the Facility. Per the district court's findings, the employees of *other* entities led day-to-day operations, made management decisions, and—critically—worked up, approved, and submitted

the 2013 and 2014 permit applications. While DTEEC oversaw EES Coke's cash management and approved capital expenditures, those are exactly the types of activities that the Supreme Court has clarified are consistent with a parent's investor status and *do not* give rise to direct liability.

**B.** DTEER and DTEES also fail to qualify as the Facility's "operators." The key DTEES employees the district court identified as directing the Facility's affairs wore not one hat, but two: Each was a dual officer of both DTEES *and* EES Coke. Such dual officers are presumed to be acting on behalf of the subsidiary—not the parent. The government introduced no evidence to overcome that presumption, nor did the court make any such findings.

**III.** If this Court reaches this issue, the relief the district court ordered— both monetary and injunctive—must be vacated.

**A.** EES Coke operated within the four corners of a valid state permit. For that, the district court imposed a $100 million civil penalty—the largest ever imposed against a stationary source in the Act's history. In so ruling, the court erred as a matter of law by treating one statutory factor as a mandatory-minimum "floor." It also failed to consider the other statutory factors; most notably, because emissions at most shifted from U.S. Steel's plant to the Facility next door, there was no *net* emissions increase, and thus no actual harm to the surrounding community. Likewise, the court applied a 1.5x *multiplier* to substantially increase the penalty,

which it based on non-statutory factors, and which it imposed despite recognizing that EES Coke made good-faith efforts to comply with the Act.

**B.** Because the statute of limitations bars the government's penalty claim, its claim for injunctive relief is likewise barred under the concurrent-remedies doctrine—as other Circuits have held for NSR claims. The government's requests for civil penalties and for an injunction rest on the same facts and vindicate the same right; they differ only in the relief sought.

**C.** The injunctive relief that the district court awarded Sierra Club is also impermissible. The quasi-legislative relief that the court awarded far exceeded its equitable authority, effectively granting class-wide relief to thousands of non-parties not before the court.

## STANDARD OF REVIEW

This Court "review[s] a grant of summary judgment de novo, construing the evidence and drawing all reasonable inferences in favor of the nonmoving party." *Rocheleau v. Elder Living Constr., LLC*, 814 F.3d 398, 400 (6th Cir. 2016). "In an appeal from a judgment entered after a bench trial," this Court reviews the district court's findings of fact for "clear error" and reviews "conclusions of law de novo." *Am. Premier Underwriters, Inc. v. Gen. Elec. Co.*, 14 F.4th 560, 568 (6th Cir. 2021).

# ARGUMENT

## I. THE DISTRICT COURT ERRED IN DETERMINING AS A MATTER OF LAW THAT EES COKE IS LIABLE UNDER THE CLEAN AIR ACT

The district court granted summary judgment on two purported violations of the Act: EES Coke's failure to obtain NSR permits and its failure to submit "reasonable possibility" reports. Neither ruling withstands scrutiny.

### A. Because Removal of the COG Combustion Limit Was Not a Major Modification, EES Coke Was Not Required to Obtain NSR Permits

NSR is a *preconstruction* permitting program. Thus, before making a change to an existing source of air pollution, a facility must project whether the change will result in a significant emissions increase and a significant net emissions increase such that it constitutes a "major modification." If so, the facility must obtain an NSR permit and install emissions controls. If not, no NSR permit is required.

To be sure, a change can be treated after-the-fact as a major modification, but only if it turns out that it "*causes* a significant emissions increase and a significant net emissions increase." Mich. Admin. Code R. 336.2902(2)(b) (emphasis added). Consistent with the regulations, this Court has held that "to qualify as a major modification," "the modification must be *the cause* of the emissions increase." *DTE*, 711 F.3d at 646 (emphasis added). Causation, in turn, requires both but-for *and* proximate causation. *Burrage v. United States*, 571 U.S. 204, 210 (2014).

24

The district court concluded that EES Coke violated the Act because it undertook a major modification—removal of the underfire COG combustion limit—without obtaining NSR permits. That conclusion was wrong. Notably, the court did not find, and the government does not contend, that this change caused a significant emissions increase at the time it was implemented or that EES Coke could have projected such an increase at that time. Indeed, it is undisputed that:

(i) EES Coke obtained a valid preconstruction permit in 2014 from EGLE, the state agency charged with administering the NSR program in Michigan;

(ii) EGLE determined that the change did not constitute a major modification triggering NSR permitting requirements, a conclusion EGLE reiterated in June 2022 after this lawsuit was filed; and

(iii) EES Coke has remained in compliance with the 2014 permit since it was issued, including the permit's limit on $SO_2$ emissions from the underfire.

Instead, the court found as a matter of law that increased combustion of COG resulted in a significant emissions increase in 2018, nearly five years *after* the project; at that time, the court concluded, it became a major modification triggering NSR requirements.

That conclusion is wrong because the emissions increase in 2018 was not caused by removal of the COG combustion limit and accompanying increase in COG combustion at the underfire. The project merely affected *where* COG was burned within the emissions unit—at the underfire versus at the flare—with the same level of resulting emissions. The emissions increase from the emissions unit *as a whole* was caused by an independent factor: U.S. Steel's curtailed demand for COG, which

25

left the Facility with more COG than anticipated and had to be burned onsite. At minimum, it was improper for the district court to resolve this issue as a matter of law at summary judgment.

### 1. Removing the COG combustion limit was not a but-for cause of the emissions increase

To establish but-for causation, the government was required to adduce evidence that the emissions increase "would not have occurred[] in the absence of—that is, but for"—elimination of the limit on the amount of COG that could be combusted at the underfire. *Burrage*, 571 U.S. at 211. Put another way, if removal of the limit "did not change anything," it could not be a but-for cause of the emissions increase. *United States ex rel. Martin v. Hathaway*, 63 F.4th 1043, 1053 (6th Cir. 2023). Here, the record shows that removal of the underfire COG combustion limit was not a but-for cause of the emissions increase because the increase would have occurred *even if* that limit had remained in effect.

a. To answer the but-for cause question, the Court merely has to follow the COG. COG is a byproduct of heating coal to make coke; the more coke that is produced, the more COG is produced. *See* Fanning Decl., RE.168-4, PageID#9321. Because burning equivalent amounts of any fuel at the underfire produces the same amount of COG, the amount of COG generated depends *solely* on the amount and type of coal charged to produce coke—*not* which fuel is used at the underfire to heat the coal. *Id.* PageID#9326-31. So when the Facility switched from fueling the

underfire with a mixture of BFG and COG to using COG exclusively, that change in itself had no effect on the amount of COG produced.

Once produced, COG must go somewhere, and there are only three possible destinations. It can be:

(1) burned as fuel at the underfire to make coke;

(2) sold (historically, primarily to U.S. Steel); or

(3) burned at the flare, typically as a last resort.

Thus, since the combustion of COG (or alternative fuels) is the predominant source of emissions from the Facility, its emissions are a direct function of two factors: how much COG is generated, and how much of that COG is sold versus burned at the Facility. But *where* the COG is burned *within* the Facility's emissions unit has no effect on the Facility's total emissions: The same amounts of $SO_2$ (and $PM_{2.5}$) are emitted whether COG is burned at the underfire or the flare. *Id.* PageID#9325.

For example, suppose in year one the Facility produces 1 million tons of coke, which in turn generates 10 million MMBtu of COG. If EES Coke sells 6 million MMBtu of COG to U.S. Steel, that leaves 4 million MMBtu of COG that it must burn at the Facility. While EES Coke would prefer to use that COG productively by burning it at the underfire, its $SO_2$ emissions will be around 2,000 tons regardless of how the 4 million MMBtu is disposed of—that is, regardless of whether EES Coke

burns 3 million MMBtu of COG at the underfire and 1 million MMBtu at the flare, or vice versa.

Now suppose that in year two, the Facility produces just 600,000 tons of coke, generating 6 million MMBtu of COG, but EES Coke sells only 1 million MMBtu of COG to U.S. Steel. In that scenario, even though EES Coke produced *less* coke and generated *less* COG, its emissions would go *up*: The Facility would burn 5 million MMBtu of COG and emit 2,500 tons of $SO_2$.

The upshot is that, because the coking process generates COG as a byproduct, and since that COG must go somewhere, removal of the COG combustion limit at the underfire could *cause* an emissions increase from the Facility under only two circumstances: (1) it resulted in increased production of coke (and thus an increase in COG), or (2) it resulted in less COG being sold.

**b.** As the record shows, however, neither scenario occurred here. Removing the COG combustion limit only affected *where* the COG was burned within the emissions unit, not *how much* COG was generated or sold.

***First***, the evidence shows that removing the COG combustion limit *did not* result in an increase in how much coke or COG the Facility produced. To the contrary, as illustrated in the table below, in the years in which the district court found a significant emissions increase, the Facility generally produced *less* coke—

and thus *less* COG—than during the 2010-2011 pre-project baseline period.[3]

*Id.* PageID#9330-31; Table, RE.261-3, PageID#17134-36. Thus, even as the Facility burned more COG at the underfire, it stopped burning BFG and there was an overall *reduction* in coke (and hence COG) production. So an increase in production was not the cause of the Facility's increased emissions.

| Year | Coke Produced (Tons) | COG Produced (MMBtu) |
|---|---|---|
| 2010 | 1,039,529 | 9,896,659 |
| 2011 | 1,016,221 | 10,050,416 |
| 2018 | 958,428 | 9,516,338 |
| 2019 | 932,394 | 9,439,540 |
| 2020 | 610,831 | 6,504,236 |
| 2021 | 962,883 | 10,027,520 |
| 2022 | 945,716 | 9,630,991 |
| 2023 | 941,259 | 9,716,692 |

**Second**, there is no evidence that removing the COG combustion limit affected third parties' demand for COG or how much COG EES Coke could sell. That factor was driven by external market forces wholly unrelated to the removal of the COG combustion limit. Plaintiffs do not argue otherwise.

Consider a counterfactual scenario in which EGLE *denied* the permit applications. In that scenario, nothing about EES Coke's fulfillment contracts or the

---

[3] The regulations allow EES Coke to select as the "baseline" any consecutive 24-month period within the immediately preceding 10-year period. Mich. Admin. Code R. 336.2901(b)(ii). EES Coke conservatively used October 2011-September 2013 as the baseline in its application for the 2014 Permit, but any consecutive 24-month period within the 10-year period immediately preceding December 2013—when the project was implemented—is permissible.

demand for coke would change. Whether EES Coke obtained the permit or not, it still had the capacity to produce the same amount of coke—as evidenced by the fact that it produced *more* coke in the baseline period than in 2018. And if EES Coke was producing the same amount of coke, it would have been producing the same amount of COG.

If EES Coke continued to produce the same amount of COG, but was operating under the old permit that limited how much COG it could burn at the underfire (and it was not selling more COG), what could EES Coke have done with that excess COG? The answer is clear: burn it at the flare. Unlike the underfire, there are *no* regulatory limits on how much COG EES Coke is allowed to flare. Fanning Decl., RE.168-4, PageID#9324. Nor does the flare have any capacity limitations; indeed, "[b]ecause it is a safety control device," the flare "must be able to process all of the COG produced at EES Coke." *Id.*

In sum, even if EES Coke never obtained the 2014 Permit, the evidence shows its emissions would have been the same. It simply would have flared all the COG it could not use at the underfire or sell.

**c.** The district court's contrary conclusion rests on three errors.

***First***, the district court failed to consider *both* the underfire *and* the flare. The 2014 Permit explicitly identifies the entire coke oven battery—including the underfire and the flare—as the relevant "emission unit." 2014 Permit, RE.168-

30

8, PageID#9377. And as the court recognized, "[t]he plain language of the regulations makes clear that determining whether an emissions increase occurred is measured based on the pollution emitted by the *emission units* that are modified by the proposed project." MSJ Op., RE.331, PageID#24341 (emphasis added); *see* Mich. Admin. Code R. 336.2902(2)(c). Yet the court limited its analysis to the underfire alone, concluding that, "but for the 2014 Permit's permanent removal of the limit on underfire COG combustion, EES Coke would not have been allowed to burn enough COG at underfire" to exceed the significance thresholds. *Id.* PageID#24343.

Contrary to the court's conclusion, "where the COG *might* have gone absent the Permit (i.e. to the flare)" is *not* "besides the point," *id.* PageID#24346; it *is* the point. The flare explains why EES Coke's emissions still would have increased even if it were operating under the pre-2014 permit conditions that limited how much COG it could burn at the underfire: EES Coke would simply have burned the excess COG at the flare. And shifting combustion from the underfire to the flare has no effect on total emissions from the *emissions unit* (underfire plus flare).

***Second***, the district court misapplied the applicable legal framework. Plaintiffs must demonstrate that the project caused a significant emissions increase *as compared to the pre-project baseline period*. Mich. Admin. Code R. 336.2902(2)(b). In finding but-for causation, the court compared actual emissions

31

from burning COG at the underfire to a hypothetical *post-project* scenario in which the Facility was constrained in how much COG it could burn at the underfire. MSJ Op., RE.331, PageID#24343.

That is the wrong comparison. Causation, like emissions, must be evaluated relative to the pre-project baseline period, taking into account the *conditions* in the baseline. In the 2010-2011 baseline period, the Facility produced more coke and more COG than after the 2014 Permit, and it did so with the pre-2014 underfire COG combustion limit in place. Fanning Decl., RE.168-4, PageID#9330-31; Table, RE.261-3, PageID#17134-36. The removal of the combustion limit therefore could not have been a but-for cause of excess COG that had to be burned at the flare. And it was that COG—in combination with U.S. Steel's drop in demand—that caused the emissions increase.

A hypothetical illustrates the flaw in the district court's logic. Consider a facility that historically operated at 80% capacity due to low market demand, but was capable of operating at 100% capacity. The facility determines that a particular component (*e.g.*, a gauge) will begin to fail in the next several years if not replaced, which would further constrain the facility's production down to 50% capacity. The facility therefore replaces the component preemptively to avoid failures, swapping in a component that is identical with respect to emissions. The facility projects that

this project—replacing an old component with a new one—will have no effect on emissions, and the project is permitted as a non-major modification.

After the project, however, demand surges unexpectedly, and the facility increases its production to 100% capacity to meet the demand, resulting in increased emissions. This is a paradigmatic example of excludable emissions that were not "caused" by the project: The increased emissions are *caused* by an independent factor (increased demand); since the facility was capable of operating at 100% capacity before the project, the increased demand could have been accommodated in the pre-project baseline period. Under the district court's reasoning, however, the project "caused" the emissions increase because, "but for" the project, the facility would have been operating at 50% capacity in the post-project period.

That cannot be right. If the district court's reasoning were correct, it would nullify the regulations' (and this Court's) instruction that major modifications include only changes that *cause* a significant emissions increase. Under the district court's approach, any project that simply allows a facility to *maintain* production capacity at current levels would be deemed the cause of any future emissions increase, even those caused by an independent factor—such as increased demand or, as here, a reduction in third-party purchases of a byproduct that must be flared onsite.

*Third*, even if the district court had made the correct comparison, its conclusion rests on a faulty assumption: If EES Coke were limited in how much COG it could

burn at the underfire, it would have been forced to reduce its coke (and thus COG) production. That assumption impermissibly resolves a central factual dispute in Plaintiffs' favor, ignoring contrary evidence that EES Coke could have burned other fuels at the underfire, including BFG or natural gas, to maintain production levels. *See* EES Coke's MSJ Opp'n, RE.208, PageID#15106-07; Fanning Dep., RE.264-1, PageID#17488-94; Van Der Poel Dep., RE.264-4, PageID#17523-24; Mourad Dep., RE.264-5, PageID#17540-41; Campbell Dep., RE.264-9, PageID#17576.

Indeed, EES Coke's expert rejected as "baseless" the contention that "EES Coke would have been forced to curtail operations in 2018 if the project had not occurred." Campbell Rep., RE.261-1, PageID#17073. As he explained, EES Coke preferred to use COG rather than BFG to avoid shortening the "useful economic life of the coke oven battery," but "EES Coke remained both physically and legally capable of continuing to operate the battery at normal levels of utilization while using both COG and BFG to meet its energy needs." *Id.* The government's expert reached a different conclusion, Second Galinsky Decl., RE.31-2, PageID#2496-98, but that disagreement among experts only confirms that this material fact dispute could not be resolved at summary judgment, *see McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 805-06 (6th Cir. 2000) (competing expert opinions on causation presented jury question and could not be resolved on summary judgment).

34

### 2. Removing the COG combustion limit was not the proximate cause of the emissions increase

"The law has long considered causation a hybrid concept, consisting of two constituent parts: actual cause and legal cause … (often called the 'proximate cause')." *Burrage*, 571 U.S. at 210 (cleaned up). The default presumption is that "a statutory cause of action"—like the one at issue here—"is limited to plaintiffs whose injuries are proximately caused by violations of the statute." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132 (2014). Such a presumption "reflects the reality that the judicial remedy cannot encompass every conceivable harm that can be traced to alleged wrongdoing." *Id.* (cleaned up). Thus, the Supreme Court has "construed federal causes of action in a variety of contexts to incorporate a requirement of proximate causation." *Id.* (collecting cases).

The Act and its implementing regulations are no exception. Nothing in the statute or regulations rebuts the default presumption, with the consequence that they must be "construed … to incorporate a requirement of proximate causation." *Id.* At least one federal court has recognized as much, acknowledging following a trial involving a major modification that the jury determined the defendant "unreasonably failed to expect" that emissions increases were the "proximate result" of refurbishment projects at a power plant. *United States v. Cinergy Corp.*, 618 F. Supp. 2d 942, 961 (S.D. Ind. 2009), *rev'd on other grounds*, 623 F.3d 455 (7th Cir. 2010).

Thus, even if removal of the combustion limit could be considered a but-for cause of the emissions increase, that is not the end of the inquiry. The government also must establish that the change was the proximate cause of the emissions increase. Although the proximate-cause inquiry "is not easy to define," at minimum it requires showing the alleged harm—here, the emissions increase—"has a sufficiently close connection" to the conduct purportedly causing the harm. *Lexmark*, 572 U.S. at 133. The government cannot make that showing here.

As explained, the Facility was producing the same amount of or less coke— and thus generating less COG—in 2018 and after, as compared to the pre-project baseline period. So how could emissions at the Facility nevertheless have increased? There was an intervening, proximate cause: U.S. Steel. Until 2016, EES Coke sent substantial amounts of COG that it generated, but could not productively use, to U.S. Steel. Fanning Decl., RE.168-4, PageID#9330-31. But once U.S. Steel began buying significantly less COG, EES Coke suddenly had large amounts of COG it could not use or sell. EES Coke was thus forced to turn to its last resort—flaring COG that previously went to U.S. Steel. *Id.*

The undisputed evidence illustrates this point. Between 2011 (shortly before the operational change) and 2018 (the first period in which the district court found a significant emissions increase), the amount of COG produced by the Facility *decreased* from roughly 10 million to 9.5 million MMBtu. *Id.* PageID#9331. Yet

during that period, the total amount of COG burned at the Facility *increased* from approximately 4.0 million to 6.6 million MMBtu. *Id.* What explains the difference? In 2011, approximately 6.1 million MMBtu of COG was sold (primarily to U.S. Steel), whereas in 2018 only 3.1 million MMBtu was sold. *Id.* (data visualized in the graph below).



Thus, even if removing the underfire COG combustion limit allowed EES Coke to generate more COG by burning more fuel than it could have under a hypothetical no-permit change scenario (which Defendants dispute), there was nevertheless a more immediate *proximate* cause of the emissions increase: U.S. Steel unexpectedly purchasing less COG from EES Coke.

U.S. Steel's reduced demand for COG left EES Coke with roughly 3 million MMBtus more COG in 2018 than in 2011. *Id.* PageID#9330-31. That COG had to be burned onsite—either at the underfire *or* flare—resulting in increased emissions. *Id.* By contrast, if U.S. Steel had purchased COG at the same rate in 2018 as in the baseline period, there would *not* have been a significant emissions increase. Thus, U.S. Steel's independent decision to purchase less COG—not removal of the underfire COG combustion limit—was the proximate cause of the emissions increase. And a third-party's "independent decisions break any plausible chain of causation." *Hathaway*, 63 F.4th at 1053.

Indeed, the district court's own reasoning drives home the point. The court acknowledged that "U.S. Steel's reduction in COG demand might explain *why* EES Coke burned more COG at underfire than it otherwise would have." MSJ Op., RE.331, PageID#24346-47.[4] But that admission gives away the game: To explain *why* EES Coke burned more COG is to identify what *caused* it to do so. And here, the court correctly identified that cause as U.S. Steel, not the permit change. In sum, while the 2014 Permit might have allowed EES Coke to combust more COG *at the underfire*, it was U.S. Steel's drop in demand for COG that was the proximate cause of the emissions increase *from the emissions unit*.

---

[4] To be clear, U.S. Steel's reduction in COG demand explains why EES Coke burned more COG at the *flare*, not the *underfire*, but the point remains the same.

**B.** **The Statute of Limitations Bars Recovery of Civil Penalties for Plaintiffs' Modification Claim**

Because the Act contains no separate limitations period for enforcement actions or citizen suits, and because Plaintiffs sought civil penalties, Am. Compl., RE.91, PageID#3833, the five-year "catch-all" statute of limitations in 28 U.S.C. § 2462 applies. *See Nat'l Parks Conservation Ass'n, Inc. v. Tennessee Valley Auth.*, 480 F.3d 410, 416 (6th Cir. 2007) (*National Parks CA6*). EPA filed suit on June 1, 2022; EPA and EES Coke agreed to exclude the period between September 1, 2019, and June 30, 2022. Compl., RE.1, PageID#1. Thus, for Plaintiffs' claim under 42 U.S.C. § 7475(a)[5] to be timely, it must have accrued within five years of the tolling period—that is, by September 1, 2014. It did not.

As its plain text makes clear—and as all Circuits to confront the issue have "unanimous[ly]" held—"§ 7475(a) unambiguously prohibits only constructing or modifying a facility without meeting PSD requirements," not "operat[ing]" a facility without a permit. *United States v. EME Homer City Generation, L.P.*, 727 F.3d 274, 284, 290-91 (3d Cir. 2013). As a result, violations of Section 7475(a) "occur at the time of construction, not on a continuing basis." *Nat'l Parks & Conservation Ass'n v. Tennessee Valley Auth.*, 502 F.3d 1316, 1322 (11th Cir. 2007) (*National Parks*

---

[5] The NNSR requirements, 42 U.S.C. § 7503; Mich. Admin. Code R. 336, Part 19, generally mirror the PSD requirements, 42 U.S.C. § 7475; Mich. Admin. Code R. 336, Part 18. Like the district court, Defendants focus here on the PSD provisions, but the result is the same under either.

*CA11*). And here, Plaintiffs allege EES Coke failed to obtain NSR permits before increasing combustion of COG at the underfire—a claim that accrued in 2013, more than five years before the beginning of the limitations tolling period.

The district court nevertheless deemed Plaintiffs' claim timely on the theory that failure to obtain a permit constituted a "continuing violation" of operational requirements. That conclusion ignores Section 7475(a)'s plain text and misconstrues this Court's opinions.

> **1.    Section 7475(a) imposes only preconstruction permitting requirements, not ongoing postconstruction requirements**

Under the Act's plain text, Section 7475(a) imposes only *preconstruction* permitting obligations, rather than ongoing operational requirements that effectively suspend the statute of limitations indefinitely.

**a.**    Section 7475(a) "does not exactly try to hide its exclusive link to construction and modification." *Homer City*, 727 F.3d at 284. "[A]fter all, the section is titled "Preconstruction Requirements"—not "Preconstruction and Operational Requirements." *Id.*; *see* 42 U.S.C. § 7475 ("Preconstruction requirements"). The provision's operative language is similarly clear:

> *No major emitting facility* on which construction is commenced after August 7, 1977, *may be constructed* in any area to which this part applies *unless*—

*Id*. § 7475(a) (emphasis added). While "construction" is defined to include "modification[s]," *see id*. § 7479(2)(C), the key phrase "may be constructed … unless" still clearly requires permission to be obtained beforehand.

The preconstruction nature of Section 7475(a)'s obligations is confirmed by its subsections specifying the conditions that must be met before the facility "may be constructed," including:

- a permit that sets emissions limitations must be "issued for such *proposed* facility," *id*. § 7475(a)(1) (emphasis added);

- the proposed facility's operator must show "that emissions from construction or operation of such facility *will not* cause, or contribute to, air pollution", *id*. § 7475(a)(3) (emphasis added);

- "the *proposed* facility" must be "subject to the best available control technology," or "BACT," for each regulated pollutant it will emit, *id*. § 7475(a)(4) (emphasis added); and

- there must have been "an analysis of any air quality impacts *projected* for the area as a result of growth associated with" the proposed facility, *id*. § 7475(a)(6) (emphasis added).

Each of these conditions is forward-looking, describing what operators must do *before* making a change—not how a facility must operate once the change is complete.

Section 7475(a) therefore "can be read only one way": Its requirements "are terms and conditions with which the facility must comply in order for the facility to begin construction." *United States v. Luminant Generation Co., L.L.C.*, 905 F.3d 874, 882 (5th Cir. 2018), *reh'g en banc granted*, 929 F.3d 316, *appeal dismissed*, 2019 WL 3778363 (5th Cir. Aug. 9, 2019). "If those requirements are not met,

construction is unauthorized." *United States v. Midwest Generation, LLC*, 694 F. Supp. 2d 999, 1003-04 (N.D. Ill. 2010), *aff'd*, 720 F.3d 644 (7th Cir. 2013). A Section 7475(a) violation is therefore "complete when construction commences without a permit in hand." *United States v. Midwest Generation, LLC*, 720 F.3d 644, 647 (7th Cir. 2013).

Equally important, a violation *does not* continue *beyond* when the change is implemented. Section 7475(a) prohibits "construct[ing]" a facility without obtaining the appropriate permit; "it does not include 'operation.'" *Homer City*, 727 F.3d at 283-85. So "[b]y its plain language, § 7475(a) itself does not impose post-construction operational obligations on facilities." *Luminant Generation*, 905 F.3d at 882; *see Sierra Club v. Otter Tail Power Co.*, 615 F.3d 1008, 1014-15 (8th Cir. 2010) (Section 7475(a) "unambiguously indicates" that its requirements "are conditions of construction, not operation."). Operating a modified facility without a preconstruction permit is simply "not articulated as a basis for a violation." *Id*. at 1015. Thus, "violation of the Preconstruction requirements under § 7475(a) occurs on the first day of unpermitted construction and the violation does not extend into operation." *Luminant Generation*, 905 F.3d at 884.

**b.** The Act's structure confirms this reading. Notably, the Act *does* include operational requirements, but in an entirely *separate* program: Title V makes it "unlawful for any person … *to operate* … a major source … except in compliance

with a permit issued by a permitting authority." 42 U.S.C. § 7661a(a) (emphasis added); *see Summit Petroleum Corp. v. U.S. E.P.A.*, 690 F.3d 733, 736 (6th Cir. 2012). Thus, when Congress wanted to establish operational conditions under the Act, it said so clearly. In the very next sentence, moreover, Congress distinguished operating obligations under Title V from the NSR program's preconstruction requirements, specifying that nothing in the subsection "shall be construed to alter the applicable requirements of [the NSR program] that *a permit be obtained before construction or modification*." 42 U.S.C. § 7661a(a) (emphasis added).

"Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983). "Congress's choice to explicitly refer to operating conditions elsewhere, but not in § 7475(a), can only be deliberate, especially in such comprehensive legislation." *Homer City*, 727 F.3d at 285.

**c.** Every court of appeals to consider the issue agrees the limitations period for a Section 7475(a) violation begins to run on the first day of unpermitted construction or a change in the method of operation:

- **Third Circuit**: "[Section] 7475(a) unambiguously prohibits only constructing or modifying a facility without meeting PSD requirements." *Homer City*, 727 F.3d at 284, 290.

43

- **Fifth Circuit:** "We join the other circuits in holding that such an action to recover civil penalties for violation of the Preconstruction requirements for major emitting facilities under 42 U.S.C § 7475(a) must be brought within five years of the first day of the alleged construction period." *Luminant Generation*, 905 F.3d at 877.

- **Seventh Circuit**: "The violation is complete when construction commences without a permit in hand. Nothing in the text of § 7475 even hints at the possibility that a fresh violation occurs every day until the end of the universe if an owner that lacks a construction permit operates a completed facility." *Midwest Generation*, 720 F.3d at 647.

- **Eighth Circuit**: "[T]he operative statutory provision states that '[n]o major emitting facility ... may be *constructed*' without meeting the PSD requirements. This language unambiguously indicates that the PSD requirements are conditions of construction, not operation." *Otter Tail*, 615 F.3d at 1014 (quoting § 7475(a)).

- **Tenth Circuit**: "[Section] 2462 requires that a suit be filed within five years of when a claim first accrues, which in this case was when OG & E commenced modification of the boiler." *Sierra Club v. Oklahoma Gas & Elec. Co.*, 816 F.3d. 666, 674 (10th Cir. 2016).

- **Eleventh Circuit**: "Violations of the preconstruction permitting requirements occur at the time of construction, not on a continuing basis." *National Parks CA11*, 502 F.3d at 1322.

These cases also make clear that "'[o]peration' of such a facility is *not* articulated as a basis for a violation of New Source Review." *Id.* at 1323 (emphasis added).

### 2. The district court erred in holding that a continuing violation exists here

The district court deemed the limitations period irrelevant because Michigan's SIP creates "an ongoing obligation to operate" a facility using BACT, such that EES Coke's alleged failure to do so was "a continuing violation" that indefinitely

"toll[ed]" the statute of limitations. Amendment Op., RE.90, PageID#3808. That analysis is incorrect.

a. The district court based its statute-of-limitations analysis not on the Act itself, but on *state* regulatory requirements implementing Section 7475(a): "In Michigan, a source with a major modification must install and operate BACT." *Id.* But a SIP cannot transform federal "Preconstruction requirements" under Section 7475 into *operational* requirements. Nor, more specifically, can a SIP transform a pre-permitting requirement under Section 7475(a)(4)—to ensure that no facility "may be constructed … unless" the "proposed facility is subject to the best available control technology"—into an ongoing operational obligation.

Indeed, BACT is not something a facility can "operate" independent of a preconstruction permit. BACT must be "determine[d]," the Act says, "on a case-by-case basis" by "the permitting authority" as part of the preconstruction permitting process. 42 U.S.C. § 7479(3). What BACT entails "is plant-specific," *Midwest Generation*, 720 F.3d at 647, and must be "tailored to each facility" by the permitting authority, *Otter Tail*, 615 F.3d at 1017. So without a preconstruction permit, there is no BACT "determin[ation]" for a particular facility—and thus no plant-specific emissions limitation for the facility to apply. To nevertheless hold that the facility must "operate" under such a limitation would subject the operator to liability for something it cannot do.

**b.** Even if a SIP could transform the preconstruction BACT requirement into an ongoing operational requirement, the district court misinterpreted Michigan's SIP. The court relied on two subrules: Mich. Admin. Code R. 336.2802(3) and R. 336.2810. *See* Amendment Op., RE.90, PageID#3808. But neither supports treating the failure to operate a plant using BACT as an ongoing violation.

Subrule 2802(3) provides only that "[n]o … major modification … shall begin actual construction without a permit to install." Mich. Admin. Code R. 336.2802(3). By its plain terms, the regulation prohibits "begin[ning]" unpermitted "construction"; it says nothing about operation. *Id.*

Subrule 2810 provides that "[a] major modification shall apply [BACT] for each regulated new source review pollutant for which it would be a significant net emissions increase at the source." Mich. Admin. Code R. 336.2810(3). While "shall apply" could be read in a vacuum to impose an ongoing operational burden, the next sentence clarifies its more limited reach: "This subrule applies to each *proposed* emissions unit at which a net emissions increase in the pollutant *would occur* as a result of a physical change or change in the method of operation in the unit." *Id.* (emphasis added). Subrule 2810(3)'s BACT requirement is thus a prerequisite for construction approval, not a condition of lawful operation.

Interpreting the Michigan SIP to create an ongoing obligation to "install and operate" BACT, as the district court did, Amendment Op., RE.90, PageID#3808,

also makes no sense. Despite its name, BACT is not a technology at all; it is a numerical "emissions limitation." Mich. Admin. Code R. 336.2801(f). BACT is therefore not something a facility can "install." Indeed, EGLE has *never* performed a plant-specific BACT analysis for the Facility; even today, no BACT limitation exists for EES Coke to "apply." The district court's view that EES Coke had to apply and operate a BACT limitation independent of the preconstruction permitting process does "not survive in the real world." *Homer City*, 727 F.3d at 288.

Unsurprisingly, other Circuits uniformly interpret language in SIPs that are functionally identical to Michigan's as imposing only a one-time obligation that occurs at the time of modification. In *National Parks CA11*, the Eleventh Circuit interpreted Alabama's SIP—which contained the same "shall apply" BACT language found in Michigan's SIP—to impose only a duty "to be met at construction time." 502 F.3d at 1324-25. Other courts agree. Texas's SIP analogously provides that BACT "must be … applied to all facilities" and that "all facilities" subject to regulation "shall … apply BACT." 30 Texas Admin. Code § 116.111(a)(2)(C). Those requirements, the Fifth Circuit held, impose "preconditions for *granting* a preconstruction permit." *CleanCOALition v. TXU Power*, 536 F.3d 469, 477 (5th Cir. 2008). The Texas SIP thus "instructs facilities what they must do to get a permit, not what obligations are imposed on the continuing operations of the facility." *Luminant Generation*, 905 F.3d at 884.

**c.** The district court, in concluding that "[i]n Michigan, a source with a major modification" has "an ongoing obligation to operate BACT," Amendment Op., RE.90, PageID#3808, relied on this Court's decision in *National Parks CA6*. That decision, however, does not support its holding.

*First*, the defendant in *National Parks CA6* did not argue that Section 7475(a) imposes only a preconstruction permitting requirement, or that SIPs are limited to implementing such a requirement. As a result, the Court had no occasion to consider those issues. Indeed, the Court did not apply the statute of limitations to Section 7475(a) at all.

*Second*, the district court held that EES Coke's alleged failure to operate BACT was "a continuing violation that tolls the statute of limitations." Amendment Op., RE.90, PageID#3808. But *National Parks CA6* expressly *declined* to assess the continuing-violation doctrine. *See* 480 F.3d at 417 ("We need not decide whether the continuing-violation doctrine applies"). Instead, the Court found "a series of discrete violations rather than a single violation," such that the plaintiff there could seek relief for the subset of violations that occurred "within the limitations period." *Id.* The Court also emphasized that recovery was *unavailable* "for conduct outside the limitations period." *Id.*

***Third***, *National Parks CA6* relied on language specific to Tennessee's SIP that does not control here. Tennessee had adopted a special provision that allowed for the issuance of a preconstruction permit even *after* construction finished:

> In the case where a source or modification was constructed without first obtaining a construction permit, a construction permit may be issued to the source or modification to establish as conditions of the permit, the necessary emission limits and requirements to assure that these regulatory requirements are met.

Tenn. Comp. R. & Regs. § 1200-3-9-.01(1)(e).

Although the provision contained permissive language, this Court reasoned that the post-construction permit obligation was nevertheless mandatory. *Nat'l Parks CA6*, 480 F.3d at 419. That was because the provision further stated that an "appropriate enforcement action *shall* be pursued" to ensure that "regulatory requirements" "w[ould] be met." *Id*. (quoting Tenn. Comp. R. & Regs. § 1200–3–9–.01(1)(e)). If a facility made a major modification without obtaining a preconstruction permit, therefore, Tennessee required the regulator to compel the facility to acquire the permit after-the-fact. *Id.* And because a facility could not secure such a permit unless the regulator first set a BACT emissions limitation, any post-construction permit would necessarily require the facility to obtain and apply such a limitation. *See id.* "[T]he duty to obtain a construction permit containing the proper emissions limits," including BACT, was thus "ongoing, even *post-construction*." *Id*.

Here, by contrast, Michigan's SIP contains no similar provision. Indeed, several Circuits have "distinguishe[d]" Tennessee's SIP on precisely this ground. *Homer City*, 727 F.3d at 290; *accord Midwest Generation*, 720 F.3d at 647; *Otter Tail*, 615 F.3d at 1017; *National Parks CA11*, 502 F.3d at 1323.

*National Parks CA6* also relied on a separate requirement under Tennessee's PSD regulations providing that "'[a] major modification *shall apply* [BACT],'" which the Court read as creating "an ongoing obligation to apply BACT." 480 F.3d at 418 (quoting Tenn. Comp. R. & Regs. § 1200-3-9-.01(4)(j)(3)). That provision is admittedly similar to Mich. Admin. Code R. 336.2810(3). But the Court interpreted the Tennessee provision as imposing an "ongoing obligation" by reading it in conjunction with a separate Tennessee-specific requirement: "Even if [defendant] had obtained a construction permit that did not require BACT," the Court explained, "such an approval 'shall not relieve any owner or operator of the responsibility to comply fully with applicable provisions under the Tennessee SIP and any other requirements under local, State, or Federal law.'" 480 F.3d at 418 (quoting Tenn. Comp. R. & Regs. § 1200-3-9-.01(4)(a)(5)). Again, there is no comparable provision under Michigan law.[6]

---

[6] Even reading subsections (4)(j)(3) and (4)(a)(5) in conjunction, it seems doubtful the Court was correct that they create an ongoing obligation. As Judge Batchelder explained in dissent, a claim based on this provision at most "constitutes a series of discrete harms and not a series of discrete violations." *National Parks CA6*, 480 F.3d

**d.** The district court ruled, in the alternative, that the government's claims did not accrue until emissions increased in 2018, MSJ Op., RE.331, PageID#24325, relying on this Court's statement in *DTE* that "EPA can bring an enforcement action whenever emissions increase, so long as the increase is traceable to the construction." 711 F.3d at 651. That, too, was error.

In *DTE*, this Court confronted a "single," limited question: "can EPA challenge" a preconstruction emissions "projection before there is post-construction data to prove or disprove it?" *Id*. at 644. The Court held that EPA *could* bring such a challenge. *Id*. at 652. EPA argued that, "[a]s a practical matter, eliminating enforcement based on emissions projections might prevent EPA from ever enforcing [the Act's PSD] requirements," because a plant operator could reduce emissions during the post-construction monitoring period, but could later increase emissions once that period had ended. U.S. Br. at 32, *DTE*, 711 F.3d 643.

This Court said EPA's warning "r[a]ng hollow." *DTE*, 711 F.3d at 652. Electric generation is "one of the most highly-regulated industries in the country"; operators are "responsible to state environmental agencies, EPA, and environmental groups, who are empowered to bring citizen suits under the Clean Air Act"; and an operator's regulating authority could request emissions information anytime to

---

at 420 (emphasis omitted). And other Circuits have expressly declined to "agree with this [Court's] interpretation" of Tennessee law. *Otter Tail*, 615 F.3d at 1016; *accord National Parks CA11*, 502 F.3d at 1324-25; *Homer City*, 727 F.3d at 287-88.

determine the status of the source's post-change emissions. *Id*. at 651-52. Such monitoring makes it "highly unlikely that an operator could escape permitting by waiting five years before increasing emissions." *Id*. at 651. Given that context, the Court suggested that "[n]either the statute nor the regulations create a time barrier" and EPA could therefore "bring an enforcement action whenever emissions increase, so long as the increase is traceable to the construction." *Id*.

The district court wrenched this Court's words, which were focused solely on EPA's monitoring-period argument, out of context. EPA filed suit in *DTE* less than a year after construction began, *id*. at 648, so this Court had no reason to (and did not) consider any issue regarding the statute of limitations. Indeed, *DTE* held only that EPA may sue *early*, not that a suit can never be too *late*. The decision does not support the district court's conclusion that EPA could sue "every day until the end of the universe." *Midwest Generation*, 720 F.3d at 647. Setting aside that "[n]othing in the text of § 7475 even hints at th[at] possibility," Supreme Court precedent "tells us not to read statutes in a way that would abolish effective time constraints on litigation." *Id*.

## C.    "Reasonable Possibility" Reporting Was Not Required

Under Michigan's SIP, if a source determines that a project does not constitute a major modification, but there is a "reasonable possibility" the project *could* later result in a significant emissions increase, the source must keep records of its

52

emissions calculation and provide notice of certain emissions increases to EGLE. Mich. Admin. Code R. 336.2902(6), (6)(e). Here, "EGLE represented to EES Coke that no reasonable possibility reporting was required under the 2014 Permit." Trial Order, RE.410, PageID#28638. So EES Coke did not submit any reports. The government nevertheless asserted an independent claim against EES Coke for failing to submit the reports, on which the district court granted summary judgment. MSJ Op., RE.331, PageID#24352. That was error.

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). Indeed, "clarity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment." *Id.* "Those regulated by an administrative agency are entitled to know the rules by which the game will be played." *Ala. Prof'l Hunters Ass'n v. FAA*, 177 F.3d 1030, 1035 (D.C. Cir. 1999).

Here, EGLE told EES Coke that "[r]easonable possibility records for $SO_2$ are not required for this project." EGLE Memo, RE.168-16, PageID#9889. Given that instruction from the state agency charged with administering Michigan's NSR program, EES Coke lacked "fair notice" it could later be subjected to liability for following EGLE's instruction. *See PHH Corp. v. CFPB*, 839 F.3d 1, 48 (D.C. Cir. 2016) (Kavanaugh, J.) ("When a government agency officially and expressly tells

you that you are legally allowed to do something," but the government nevertheless "sanctions you for actions you took in reliance on the government's assurances, that amounts to a serious due process violation.").

EES Coke did exactly what EGLE instructed it to do. The government's theory—and the district court's ruling—would impose liability for failing to submit reports that EGLE expressly said were unnecessary. Such "gamesmanship" is "fatal" to the government's claim. *Id.* at 44, 49.

## II. THE PARENT DEFENDANTS ARE NOT THE FACILITY'S "OPERATORS"

The Act authorizes EPA to seek enforcement against any person that is the "owner or operator of … a major stationary source" that has violated an applicable SIP. 42 U.S.C. § 7413(b). The Act defines "owner or operator" as "any person who owns, leases, operates, controls, or supervises a stationary source." *Id.* § 7411(a)(5). Courts construing these terms often follow *United States v. Bestfoods*, 524 U.S. 51, 62 (1998), which interpreted CERCLA's similar definition of "owner or operator." *See, e.g.*, *United States v. Anthony Dell'Aquilla, Enters. & Subsidiaries*, 150 F.3d 329, 334 (3d Cir. 1998). The parties agree that *Bestfoods* governs this issue. MSJ Op., RE.331, PageID#24356.

Under *Bestfoods*, "an operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility." 524 U.S. at 66. The governing statute's subject-matter also factors into the analysis: "an operator must manage,

direct, or conduct operations *specifically related to pollution*." *Id.* at 66-67 (emphasis added). The "critical question" under this inquiry is whether "actions directed to the facility by an agent of the parent alone are eccentric under accepted norms of parental oversight of a subsidiary's facility." *Id.* at 72. This Court has accordingly "adopted an 'actual control' test to help resolve whether an entity is an operator." *Am. Premier Underwriters, Inc. v. Gen. Elec. Co.*, 14 F.4th 560, 574 (6th Cir. 2021).[7]

EES Coke, which owns and operates the Facility, has four corporate parents. Pretrial Order, RE.372, PageID#25714, 25721-22. EES Coke is a wholly owned subsidiary of DTE Coke Holdings, which is a wholly owned subsidiary of DTEES; DTEES is a subsidiary of DTEER; and DTEER is a subsidiary of DTEEC:



*Id.*

---

[7] Determining a parent entity's operator status is typically a mixed question of law and fact. *Id.* at 568-69. Here, however, the relevant facts are undisputed. When "a district court has applied undisputed facts against a legal standard, a circuit court can review de novo." *Id.* at 569 n.1.

In 2008, DTEES and EES Coke entered a Management Services Agreement (MSA). App. 8-53. Under the 2008 MSA, DTEES "shall … provide all services as may be required to facilitate the proper management and administration of [EES Coke's] activities in respect of the Facility, including those services more particularly described in Schedule A." *Id.* at 18. In 2017, DTEES and DTEER entered a separate MSA that allowed DTEER to act on DTEES's behalf for work related to the Facility. *Id.* at 1-7.

## A.    DTEEC Is Not an "Operator" of the Facility

DTEEC—the ultimate parent company *four* levels removed from EES Coke—did not "operate" the Facility, even under the district court's overbroad reading of *Bestfoods*. In fact, it was hardly involved at all, as made clear by the district court's own findings of fact.

The district court made no findings that employees of DTEEC managed the Facility's affairs. Trial Order, RE.410, PageID#28622-23, 28630-32. Instead, It found that DTEEC "managed EES Coke's cash on its behalf, including cash used on environmental issues and the 2014 Permit," and approved "capital expenditures" and certain COG sales. *Id.* PageID#28630-31. But such conduct is exactly the type that the Supreme Court identified as *in*sufficient to establish a parent's operator liability: "Activities that involve the facility, but which are consistent with the parent's investor status, such as … *supervision of the subsidiary's finance and capital budget*

56

*decisions … should not give rise to direct liability.*" *Bestfoods*, 524 U.S. at 72 (emphasis added). Under *Bestfoods*, managing EES Coke's cash and approving expenditures do not establish DTEEC exercised actual *control* of the Facility.

### B. Neither DTEER Nor DTEES Is an "Operator" of the Facility

Because "corporate personalities remain distinct," *Bestfoods* accepts the "well established principle [of corporate law] that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership." 524 U.S. at 69 (cleaned up). Accordingly, "courts generally presume that the directors are wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary." *Id.* (cleaned up); *see Atlanta Gas Light Co. v. UGI Utils., Inc.*, 463 F.3d 1201, 1204 (11th Cir. 2006) (*Bestfoods* "established a presumption" that "overlapping officers and directors" were "acting in their capacities as officers and directors of the subsidiary, and not of the parent") (cleaned up); *Raytheon Constructors, Inc. v. Asarco Inc.*, 368 F.3d 1214, 1217-20 (10th Cir. 2003) (reversing district court for failing to apply presumption).

Thus, when considering actions undertaken by a dual-officer, the actions may be attributed to the parent only if the government can overcome the subsidiary-hat presumption by showing the dual officers were "acting in their capacities as [parent] officers and directors, *and not* as [subsidiary] officers and directors." *Bestfoods*, 524

U.S. at 69-70 (emphasis added). And while the Supreme Court declined to "recite the ways in which the Government could show that dual officers … were in fact acting on behalf of the parent," the Court clarified that "the presumption … is strongest when the act is perfectly consistent with the norms of corporate behavior, but wanes as the distance from those accepted norms approaches the point of action by a dual officer plainly contrary to the interests of the subsidiary yet nonetheless advantageous to the parent." *Id*. at 70 n.13.

Here, the district court erred by failing to acknowledge—much less to apply—the presumption that officers "are wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary." *Id.* at 69. The court's determination that DTEES and DTEER operated the Facility rested primarily on findings regarding who led the Facility's day-to-day operations and who was responsible for EES Coke obtaining the 2013 and 2014 Permits. *See, e.g.*, Trial Order, RE.410, PageID#28628-30. But all personnel the court identified related to those activities were dual officers of *both* DTEES *and* EES Coke. For example, the court found that Ronald Burnette and Marion Krchmar led the Facility's "day-to-day operations and ma[de] day-to-day management decisions." Trial Order, RE.410, PageID#28617-18. Both were dual officers: Burnette served as the Facility's Plant Manager from 2012-2015, succeeded by Krchmar. *Id.*

Under *Bestfoods*, therefore, both Burnette and Krchmar are *presumed* to have been acting for EES Coke—not DTEES—when managing the Facility's day-to-day operations. *See Atlanta Gas Light Co.*, 463 F.3d at 1206 (parent employee "managed the plant for a short while, [and] was appointed acting superintendent during that period, and thus is presumed to have been working on behalf of [the subsidiary], not [the parent]."); *Raytheon*, 368 F.3d at 1220 ("[W]e are required by *Bestfoods* to presume that Mr. Stearns' actions in 'helping the [the subsidiaries'] mines to function' were taken in the ordinary course of his role as [the parent's] president."); *Consol. Edison Co. of N.Y., Inc. v. UGI Utils., Inc.*, 153 F. App'x 749, 751–53 (2d Cir. 2005) (finding evidence of "overlapping officers and directors between parent and subsidiary" and "close parental control of the subsidiaries' expenditures" insufficient to "rebut[] the presumption that dual officers and directors can faithfully serve both parent and subsidiary"). The district court identified no "action" by either of them that was "plainly contrary to the interests of the subsidiary yet nonetheless advantageous to the parent," nor any other deviation from "accepted norms." *Bestfoods*, 524 U.S. at 70 n.13.

As for the permits, the district court found that "Mr. Burnette and Mr. Gross made the final decision to seek the 2013 Permit and the 2014 Permit." Trial Order, RE.410, PageID#28618. Like Burnette, Gross was a dual officer of DTEES and EES Coke, having served as EES Coke's Vice President from 2008 to

2015. *Id.* PageID#28617. Here, too, the government introduced no evidence, nor did the district court make any findings, identifying any dual-officers actions that were "plainly contrary to the interests of the subsidiary yet nonetheless advantageous to the parent." *Bestfoods*, 524 U.S. at 70 n.13.

Indeed, the *only* relevant evidence introduced by the government came through its expert, Daniel Leistra-Jones, who admittedly had no personal knowledge of any of these facts. Trial Tr., RE.374, PageID#26062. In fact, the government called *no* fact witness with knowledge of any actions alleged to create control; nor did it introduce any document through a fact witness with such knowledge. While a district court may consider materials introduced by an expert to help it understand the expert's opinions, they are not evidence. *See Engebretsen v. Fairchild Aircraft Corp.*, 21 F. 3d 721, 728 (6th Cir. 1994); *Fish Farms P'ship v. Winston-Weaver Co.*, 531 Fed. App's 711, 712 (6th Cir. 2013). In sum, there was *no* competent evidence on which the district court could have based its control findings.

To be sure, not all of the identified personnel were dual employees. But the district court's factual findings make clear why that is irrelevant: "*All personnel working to service EES Coke take direction from Mr. Burnette.*" Trial Order, RE.410, PageID#28618 (emphasis added). In other words, while there may have been other DTEES and DTEER employees performing various tasks for the Facility, it was Burnette who actually "direct[ed] the workings of, manag[ed], or

60

conduct[ed] the affairs of" the facility. *Bestfoods*, 524 U.S. at 66. And as a dual officer, Burnette is presumed to act on behalf of EES Coke.

Contrary to the district court's conclusion, moreover, the MSAs *refute* operator liability rather than support it. A parent's decision to "monitor and control" its subsidiary by "enter[ing] into service agreements under which" it provides services is "consistent with … a parent corporation managing the activities of its subsidiary." *N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp.*, 766 F.3d 212, 223 (2d Cir. 2014).

The district court nevertheless held that such MSAs "do[] not, standing alone, insulate the parent from operator liability." Trial Order, RE.410, PageID#28627. But the 2008 MSA confirms that when dual officers managed the Facility's affairs, they were wearing their EES Coke hats—*not* their DTEES hats. App. 18, 43 (DTEES would "provide all services … to facilitate the proper management … *of* [*EES Coke's*] *activities*" at the Facility and would "act *on* [*EES Coke's*] *behalf*") (emphasis added). The court tacitly admitted as much, claiming that the *lack* of an MSA between DTEER and DTEES before 2017 "means that any actions taken by DTEER employees on behalf of EES Coke before April 2017 were taken solely in their capacity as DTEER employees." Trial Order, RE.410, PageID#28620. The court cannot have it both ways: If the lack of an MSA somehow establishes that

DTEER employees were acting *solely* in their DTEER capacity, then the 2008 MSA

establishes that DTEES employees were always working in a *dual* capacity.

## III. THE DISTRICT COURT ERRED IN AWARDING MONETARY AND INJUNCTIVE RELIEF

### A. The Civil Penalty Should Have Been Leveled Down, Not Up

EES Coke indisputably complied at all times with its state-issued permit, and

EGLE determined—both at the time of permitting and after EPA initiated this

action—that EES Coke *never* violated the Act. Yet the district court nevertheless

imposed an unprecedented $100 million fine—the largest stationary-source civil

penalty in the Act's history. Even if the Court affirms on liability, nothing in EES

Coke's conduct justifies this historically harsh punishment.[8]

***First***, the district court began its assessment from the legally mistaken premise

that the economic benefit to Defendants is a "floor" beneath which the penalty could

not go. Trial Order, RE.410, PageID#28636. Nothing in the statute justifies that

premise. Instead, the Act provides that courts "*shall* take into consideration" at least

seven factors:

---

[8] In the penalty context, "the statutory interpretation behind the district court's decision" is reviewed de novo, and "review of the district court's legal construction of the [Act's] penalty factors is plenary." *Pound v. Airosol Co., Inc.,* 498 F.3d 1089, 1094 (10th Cir. 2007) (cleaned up).

[1] the size of the business, [2] the economic impact of the penalty on the business, [3] the violator's full compliance history and good faith efforts to comply, [4] the duration of the violation as established by any credible evidence (including evidence other than the applicable test method), [5] payment by the violator of penalties previously assessed for the same violation, [6] the economic benefit of noncompliance, and [7] the seriousness of the violation.

42 U.S.C. § 7413(e)(1) (emphasis added). The text gives no indication that "the economic benefit of noncompliance" serves as a mandatory minimum or that any factor should play a more important role than the others.

The lone authority on which the district court relied for the proposition that economic benefit is a mandatory minimum is a three-decades-old district court decision. *See United States v. Midwest Suspension & Brake*, 824 F. Supp. 713 (E.D. Mich. 1993), *aff'd*, 49 F.3d 1197 (6th Cir. 1995). But that case held the *opposite*, concluding that economic benefit "neither establishes a floor below which the maximum civil penalty should not be reduced nor mitigates in favor of reducing the maximum civil penalty." *Id.* at 737; *accord Pound,* 498 F.3d at 1095.

Even assuming the district court had discretion to balance the factors articulated in Section 7413(e)(1) to fashion an appropriate penalty, "[a] district court by definition abuses its discretion when it makes an error of law." *Koon v. United States*, 518 U.S. 81, 100 (1996); *see Betts v. Costco Wholesale Corp.*, 558 F.3d 461, 467 (6th Cir. 2009); *Augustyn v. Wall Twp. Bd. of Educ.*, 139 F.4th 252, 262 (3d Cir. 2025) (holding, in context of fee award, district court abused its discretion by

considering "impermissible factors"). Thus, at minimum, the court's treatment of the economic benefit factor as a "floor" for its civil penalty requires vacatur. Trial Order, RE.410, PageID#28636.

***Second***, the district court impermissibly increased the penalty by 50% without identifying any statutorily permissible reason for doing so. Instead, the court relied exclusively on *non*-statutory factors: "To ensure the civil penalty levels the economic playing field and adequately deters future Clean Air Act violations . . . ." *Id.* PageID#28637. While the non-statutory goals of "level[ing] the economic playing field" and "deter[rence]" could theoretically overlap (however imperfectly) with the six remaining statutory factors, the court made *no* findings under *any* of those factors. It simply announced, without analysis or factual basis, that those considerations justified increasing the already-massive penalty to a historically unprecedented level.

The district court's stated intent—to "deter[] future Clean Air Act violations," *id.*—also makes little sense on its own terms. EES Coke believed it was doing everything by the book, as did EGLE, which told EES Coke no NSR permit was necessary. Imposing a hefty penalty will accordingly have no deterrent effect here. If anything, the court's decision signals that businesses cannot rely on state permitting decisions, eroding the Act's cooperative-federalism regime.

Had it considered the remaining statutory factors, the district court would have concluded that the penalty should have been *reduced*. Most notably, the court failed to analyze the (lack of) seriousness of the purported violations. The alleged emission increase did not result in net harm to the environment; it merely shifted emissions from one side of the street to the other. Indeed, the government has never refuted EES Coke's evidence that, considered together, U.S. Steel's and the Facility's total $SO_2$ emissions *decreased* during the relevant period. *See* Chart, RE.318-3, PageID#23939; App. 72-73.

The Act specifies that courts "*shall* take into consideration" the seven factors listed in the statute when imposing penalties. 42 U.S.C. § 7413(e)(1) (emphasis added). The text thus imposes "a legal obligation to consider each of the factors set forth in the Act," *Anthony Dell'Aquilla,* 150 F.3d at 339, and "the failure to consider the enumerated factors in § 7413(e)(1) is reversible error," *Pound,* 498 F.3d at 1098.

***Finally***, the district court also abused its discretion by reducing the penalty by only $5 million, despite EES Coke's acknowledged good-faith efforts to comply. When EGLE approved the 2014 Permit, EGLE *expressly* determined that EES Coke was *not* required to obtain NSR permits. EGLE Memo, RE.168-16, PageID#9896; App. 75. No one disputes that, at all times, the Facility operated in compliance with the 2014 Permit. *See* App. 75. And even after EPA initiated this action, EGLE reaffirmed its view that EES Coke *had not* violated the Act because "there were

legitimate reasons unrelated to the project that caused higher than anticipated emissions." *Id.* at 76.

Thus, EES Coke reasonably relied on EGLE's determination that no NSR permits were required. To nevertheless levy such an onerous penalty undermines fundamental fairness. *See Sierra Club v. Khanjee Holding (US), Inc.*, 655 F.3d 699, 708 (7th Cir. 2011) (courts have "expressed discomfort with the idea that a penalty may be imposed where a defendant is unaware of a violation").

## B. The Concurrent-Remedies Doctrine Bars the Government's Requested Injunctive Relief

Under the concurrent-remedies doctrine, "equity will withhold its relief in such a case where the applicable statute of limitations would bar the concurrent legal remedy." *Cope v. Anderson*, 331 U.S. 461, 464 (1947). "[R]emedies are concurrent" if a suit in equity "and an action at law can be brought on the same facts." *Otter Tail*, 615 F.3d at 1019 (cleaned up). Thus, an "equitable claim is barred where the only difference between it and a time-barred legal claim is the relief sought." *Sierra Club v. Okla. Gas & Elec. Co.*, 816 F.3d 666, 675 (10th Cir. 2016).

Here, the concurrent-remedies doctrine applies because the government's requests for civil penalties and injunctive relief are inextricably intertwined. The only difference is the relief sought; both requests for relief seek "to vindicate the same right." *Otter Tail*, 615 F.3d at 1018. Because the statute of limitations bars the government's legal claim for civil penalties, any concurrent equitable claim for an

injunction is likewise time-barred, as other Circuits have held specifically under

Section 7475(a). *See Okla. Gas & Elec.*, 816 F.3d at 675-76; *Otter Tail*, 615 F.3d at

1018-19; *National Parks CA11*, 502 F.3d at 1326-28.

### C. The District Court Exceeded Its Authority in Granting the Sierra Club's Requested Injunctive Relief

Issuing equitable injunctive relief "is an extraordinary step that courts must

not take lightly." *Aluminum Workers Int'l Union, AFL-CIO, Loc. Union No. 215 v.*

*Consol. Aluminum Corp.*, 696 F.2d 437, 446 (6th Cir. 1982). "Though flexible," a

court's equitable authority "is not freewheeling," *Trump v. CASA, Inc.*, 606 U.S.

831, 841 (2025), and "courts have historically refused to grant relief to nonparties,"

*Shangrila P'ship v. Lemos*, No. 25-1495, 2025 WL 3245076, at \*4 n.5 (6th Cir.

Nov. 20, 2025) (quoting *CASA*, 606 U.S. at 844).

Here, the district court exceeded its authority in ordering expansive,

legislative-like injunctive relief targeted at non-parties.[9] After recounting facts

related to just three Sierra Club members—whose injuries ranged from "eye

irritation" and "a bad feeling" in the chest, to reduced bike riding and gardening

time, Trial Order, RE.410, PageID#28650—the court ordered a slew of ultra-

specific remedies for the benefit of "households within communities near the

---

[9] In reviewing a district court's grant of a permanent injunction, this Court reviews legal conclusions *de novo* and the scope of injunctive relief for abuse of discretion. *Tenn. Clean Water Network v. Tenn. Valley Auth.*, 905 F.3d 436, 442 (6th Cir. 2018).

Facility." *Id.* PageID#28653. This "universal" class of beneficiaries within the region is considerably broader than Sierra Club's membership. *See CASA*, 606 U.S. at 837. Such non-party relief "falls outside the bounds of [the] court's equitable authority." *Id.* at 847. Nor did the court make any finding that affording relief to this broad class was "no more burdensome to the defendant than necessary to provide complete relief *to the plaintiffs*." *Id.* at 852.

The scope of the relief ordered underscores the district court's overreach. The court required Defendants to establish a "Community Quality Action Committee," which Defendants must convene quarterly. Trial Order, RE.410, PageID#28653-54. The purpose of the Committee is *not* directed at Sierra Club or its members, but at the wider public: Its "goal" is to "select projects" to "maximiz[e] public health and air quality" throughout the region. *Id.* PageID#28654. But the court has no equitable authority to issue relief to non-parties, *see CASA*, 606 U.S. at 847, nor may courts "grant remedies that are broader than necessary to provide complete relief to … individual plaintiff[s]," *Doe v. Burlew*, 165 F.4th 525, 530 (6th Cir. 2026) (cleaned up); *see Sharpe v. Cureton*, 319 F.3d 259, 273 (6th Cir. 2003) (district court improperly granted "class-wide relief" even though plaintiffs "never sought nor received class certification").

This Court should narrow the district court's injunction to the parties that were actually before it, or remand with instructions to reconsider the injunction's scope.

## CONCLUSION

This Court should reverse.


Dated: June 25, 2026

Michael P. Hindelang
S. Lee Johnson
HONIGMAN LLP
660 Woodward Ave.
Detroit, MI 48226
Telephone: (313) 465-2506

Molly K. McGinley
HONIGMAN LLP
321 North Clark Street, Suite 500
Chicago, IL 60654
Telephone: (312) 429-6032

Respectfully submitted,

*/s/ Allon Kedem*
Allon Kedem
Dirk Phillips
Brian Williams
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue NW
Washington, DC 20001
Telephone: (202) 942-5000
allon.kedem@arnoldporter.com

S. Zachary Fayne
ARNOLD & PORTER KAYE SCHOLER LLP
Four Embarcadero Center, 14th Floor
San Francisco, CA 94111
Telephone: (415) 471-3100

*Counsel for Defendants-Appellants*

# CERTIFICATE OF COMPLIANCE

1.     This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) and the Court's Order of June 22, 2026, because excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 14,988 words.

2.     This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Times New Roman in 14-point font.

Dated: June 25, 2026                    Respectfully submitted,

                                        */s/ Allon Kedem*
                                        Allon Kedem

**CERTIFICATE OF SERVICE**

I hereby certify that on June 25, 2026, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the CM/ECF system. I certify that participants in the case that are registered CM/ECF users will be served by the CM/ECF system.

*/s/ Allon Kedem*
Allon Kedem

# ADDENDUM

## DESIGNATION OF RELEVANT ORIGINATING DOCUMENTS

Pursuant to 6 Cir. R. 28(b)(1)(A)(i), Appellants EES Coke Battery, LLC; DTE Energy Services, Inc.; DTE Energy Resources, LLC; and DTE Energy Company respectfully designate the following relevant originating court documents, with Page ID # range, where applicable:

- Compl., RE.1, PageID#1-22

- Second Galinsky Decl., RE.31-2, PageID#2486-508

- Intervenors' Order, RE.38, PageID#2641-43

- Amendment Op., RE.90, PageID#3784-810

- Am. Compl., RE.91, PageID#3811-3834

- Fanning Decl., RE.168-4, PageID#9315-32

- EES Coke's Resp. to EGLE, RE.168-6, PageID#9366-69

- 2014 Permit, RE.168-8, PageID#9371-409

- 2014 Permit Application, RE.168-9, PageID#9410-629

- 2013 Permit Application, RE.168-10, PageID#9630-850

- Blathras Dep., RE.168-13, PageID#9863-68

- EGLE Memo, RE.168-16, PageID#9885-98

- EES Coke's MSJ Opp'n, RE.208, PageID#15097-128

- Campbell Report, RE.261-1, PageID#17052-107

- Table, RE.261-3, PageID#17133-42

- Fanning Dep., RE.264-1, PageID#17486-96

- Van Der Poel Dep., RE.264-4, PageID#17518-37

- Mourad Dep., RE.264-5, PageID#17538-47

- Campbell Dep., RE.264-9, PageID#17563-80

- Chart, RE.318-3, PageID#23938-39

- MSJ Opinion, RE.331, PageID#24325-65

- Pretrial Order, RE.372, PageID#25688-819

- Trial Tr., RE.374, PageID#26020-83

- Trial Tr., RE.386, PageID#26887-987

- Trial Tr., RE.391, PageID#27363-476

- Defs.' Proposed Findings of Fact, RE.408, PageID#28502-68

- Trial Order, RE.410, PageID#28605-56

- Order Den. Defs.' R. 52(c) Mot., RE.411, PageID#28657-58

- Judgment, RE.412, PageID#28659-63

- Notice of Appeal, RE.418, PageID#28718-20