No. 26-1296

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

SIERRA CLUB; CITY OF RIVER ROUGE, MI,
*Intervenors-Plaintiffs-Appellees*,

v.

EES COKE BATTERY, LLC; DTE ENERGY SERVICES, INC.; DTE ENERGY COMPANY; DTE ENERGY RESOURCES, LLC
*Defendants-Appellants*.

Appeal from the United States District Court
for the Eastern District of Michigan
No. 2:22-cv-11191 (Hon. Gershwin A. Drain)

**UNITED STATES' ANSWERING BRIEF**


OF COUNSEL:

CHRISTOPHER GRUBB
JUSTIN BERCHIOLLI
Assistant Regional Counsel
U.S. EPA, Region 5
77 West Jackson Boulevard
Chicago, IL 60604

TERESA DYKES
Attorney Advisor
Office of Enforcement and Compliance Assurance
U.S. EPA
1200 Pennsylvania Avenue
Washington, DC 20460

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*

THOMAS A. BENSON
SASHA ALVARENGA
SAMANTHA RICCI
DANIEL HALAINEN
JACOB D. ECKER
*Attorneys*
Env't and Natural Resources Div.
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 532-3045
jacob.ecker@usdoj.gov

**TABLE OF CONTENTS**

TABLE OF CONTENTS ........ i

TABLE OF AUTHORITIES ........ iv

STATEMENT REGARDING ORAL ARGUMENT ........ x

INTRODUCTION ........ 1

STATEMENT OF THE ISSUES ........ 3

STATEMENT OF THE CASE ........ 4

I. Legal Background ........ 4

   A. The Clean Air Act ........ 4

   B. New Source Review Program ........ 5

   C. Michigan's SIP Provisions ........ 7

   D. Other Relevant Provisions ........ 9

II. Factual Background ........ 10

   A. Defendants' Zug Island Facility ........ 10

   B. The 2014 Permit ........ 14

   C. The Facility's Emissions Increases ........ 16

III. Procedural History ........ 18

   A. The Suit ........ 18

   B. Summary Judgment ........ 20

   C. Trial ........ 22

SUMMARY OF THE ARGUMENT ........ 24

STANDARD OF REVIEW........ 29

ARGUMENT ........ 30

I. The district court correctly granted summary judgment for the United States. ........ 30

A. Permanently removing the underfire COG limit resulted in significantly higher emissions and therefore triggered major source NSR. ........ 31

1. There is no dispute that permanently removing the underfire COG limit resulted in significantly higher emissions of sulfur dioxide and fine particulate matter. ........ 31

2. Defendants' arguments about what might have happened without the COG-limit's permanent removal are irrelevant. ........ 35

3. There is no genuine dispute that Defendants considered COG the sole viable fuel for the facility's ovens. ........ 40

4. Defendants' newfound proximate cause arguments are forfeited and incorrect. ........ 48

B. The United States' claims were timely. ........ 53

1. The United States' claims accrued when emissions increased........ 53

2. Michigan's SIP imposes ongoing obligations and claims for noncompliance accrue anew each day. ........ 55

3. The United States' claim is timely even under Defendants' theory. .......... 60

C. The district court correctly held Defendants liable for reporting violations on summary judgment.......... 62

II. The district court did not abuse its discretion or clearly err in its operator liability finding and in granting the United States' requested relief after trial. .......... 63

A. The district court did not clearly err in finding that all defendants are operators of the facility.......... 64

B. The district court did not abuse its discretion in imposing a $100 million civil penalty for Defendants' principal NSR violation. .......... 72

C. The United States' request for injunctive relief is not barred. .......... 75

CONCLUSION .......... 76

CERTIFICATE OF COMPLIANCE .......... 78

CERTIFICATE OF SERVICE .......... 79

ADDENDUM: DESIGNATION OF RELEVANT DOCUMENTS .......... 80

## TABLE OF AUTHORITIES

**Cases**

*Am. Premier Underwriters, Inc. v. Gen. Elec. Co.*,
14 F.4th 560 (6th Cir. 2021) .................................... 30, 65, 66, 71

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (2021) .................................................... 42, 43, 45

*Atl. States Legal Found., Inc. v. Tyson Foods, Inc.*,
897 F.2d 1128 (11th Cir. 1990) .................................................. 74

*Bannister v. Knox Cnty. Bd. of Educ.*,
49 F.4th 1000 (6th Cir. 2022) .................................................... 49

*Bufkin v. Collins*,
604 U.S. 369 (2025) ...................................................................... 66

*Burrage v. United States*,
571 U.S. 204 (2014) ............................25, 26, 36, 37, 38, 39, 49, 51

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
603 U.S. 799 (2024) ...................................................................... 54

*Gen. Motors Corp. v. United States*,
496 U.S. 530 (1990) ........................................................................ 4

*Harvis v. Roadway Exp. Inc.*,
923 F.2d 59 (6th Cir. 1991) ......................................................... 47

*Hirsch v. CSX Transp.*, Inc.,
656 F.3d 359 (6th Cir. 2011) ....................................................... 29

*Jordan v. Howard*,
987 F.3d 537 (6th Cir. 2021) ....................................................... 42

*Kentucky Res. Council, Inc. v. EPA*,
467 F.3d 986 (6th Cir. 2006) ......................................................... 5

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014) .......... 50, 52

*Max Trucking, LLC v. Liberty Mut. Ins. Corp.*,
802 F.3d 793 (6th Cir. 2015) .......... 67, 68

*McGirt v. Oklahoma*,
591 U.S. 894 (2020) .......... 50

*New York v. EPA*,
413 F.3d 3 (D.C. Cir. 2005) .......... 50

*N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp.*,
766 F.3d 212 (2d Cir. 2014) .......... 71

*Nat'l Parks Conserv. Ass'n, Inc. v. TVA*,
480 F.3d 410 (6th Cir. 2007) .......... 19, 20, 21, 22, 27, 56, 57, 58, 59

*Nat'l Parks & Conserv. Ass'n, Inc. v. TVA*,
502 F.3d 1316 (11th Cir. 2007) .......... 58

*Ohio State Univ. v. Redbubble, Inc.*,
989 F.3d 435 (6th Cir. 2021) .......... 49

*Sierra Club v. Otter Tail Power Co.*,
615 F.3d 1008 (8th Cir. 2010) .......... 59

*Sierra Club v. Okla. Gas and Elec. Co.,*
816 F.3d. 666 (10th Cir. 2016) .......... 75

*T. Marzetti Co. v. Roskam Baking Co.*,
680 F.3d 629 (6th Cir. 2012) .......... 30

*U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 583 U.S. 387 (2018) .......... 30, 31, 32, 66

*United States v. Ameren Missouri*,
9 F.4th 989 (8th Cir. 2021) .......... 39

*United States v. Anthony Dell'Aquilla, Enters. & Subsidiaries*, 150 F.3d 329 (3d Cir. 1998) .......... 52

*United States v. B&W Inv. Props.*, 38 F.3d 362 (7th Cir. 1994) .......... 9, 10, 72

*United States v. Banks,* 115 F.3d 916 (11th Cir. 1997) .......... 75

*United States v. Bestfoods*, 524 U.S. 51 (1998) .......... 22, 23, 64, 66, 67, 68, 69, 70, 71

*United States v. DTE Energy Co.,* (*DTE I*), 711 F.3d 643 (6th Cir. 2013) .......... 5, 6, 50, 54, 55

*United States v. DTE Energy Co.,* (*DTE II*), 845 F.3d 735 (6th Cir. 2017) .......... 8, 39, 41

*United States v. EME Homer City Generation, L.P.*, 727 F.3d 274 (3d Cir. 2013) .......... 59

*United States v. Midwest Generation, LLC*, 720 F.3d 644 (7th Cir. 2013) .......... 59

*United States v. Midwest Suspension & Brake*, 49 F.3d 1197 (6th Cir. 1995) .......... 72

*United States v. Mun. Auth. of Union Twp.*, 150 F.3d 259 (3d Cir. 1998) .......... 73

*Williamson v. Recovery Ltd. P'ship*, 731 F.3d 608 (6th Cir. 2013) .......... 62, 63

*Wisconsin v. EPA*, 938 F.3d 303 (D.C. Cir. 2019) .......... 59

**Statutes**

28 U.S.C. § 2462 .......... 9, 53, 54

42 U.S.C. § 7401(b)(1) .......... 4
42 U.S.C. § 7402 .......... 6
42 U.S.C. § 7409 .......... 4
42 U.S.C. § 7410 .......... 5
42 U.S.C. § 7411(a)(4) .......... 49
42 U.S.C. § 7411(a)(5) .......... 9, 64
42 U.S.C. § 7413 .......... 63
42 U.S.C. § 7413(a)(1) .......... 5
42 U.S.C. § 7413(b) .......... 9, 64
42 U.S.C. § 7413(e) .......... 9, 23, 24, 72
42 U.S.C. § 7413(e)(1) .......... 9, 23, 72
42 U.S.C. § 7475(a) .......... 5, 6, 57
42 U.S.C. § 7479(2)(c) .......... 6
42 U.S.C. § 7479(3) .......... 6
42 U.S.C. § 7501(3) .......... 6
42 U.S.C. § 7503 .......... 5, 6
42 U.S.C. § 7503(a)(2) .......... 6
42 U.S.C. § 7507(a)(2) .......... 6
42 U.S.C. § 7607(b)(1) .......... 6
42 U.S.C. § 7607(b)(2) .......... 59

## Rules

Fed. R. Civ. P. 56(a) .......... 29

## Regulations

40 C.F.R. § 50.4 .......... 4

40 C.F.R. § 50.2 .......... 4

40 C.F.R § 52.21(a)(2)(iv)(B) .......... 9, 53, 54

40 C.F.R. § 50.4 .......... 4

40 C.F.R. § 50.5 .......... 4

40 C.F.R. § 50.7 .......... 4

Mich. Admin. Code R. 336.1201(1) .......... 9

Mich. Admin. Code R. 336.2801(b)(ii) .......... 32

Mich. Admin. Code R. 336.2801(qq) .......... 18, 34

Mich. Admin. Code R. 336.2802(4)(b) .......... 7, 31, 33, 34, 35, 38, 55

Mich. Admin. Code R. 336.2802(4)(c) .......... 32

Mich. Admin. Code R. 336.2810(3) .......... 8, 55, 56

Mich. Admin. Code R. 336.2818(1) .......... 8, 55, 56, 57

Mich. Admin. Code R. 336.2901(b)(ii) .......... 32

Mich. Admin. Code R. 336.2901(eee)(ii)(C) .......... 8, 38, 39

Mich. Admin. Code R. 336.2901(hh) .......... 18, 34

Mich. Admin. Code R. 336.2902 .......... 7

Mich. Admin. Code R. 336.2902(2) .................................... 35, 38, 49, 55

Mich. Admin. Code R. 336.2902(2)(b) .............................. 7, 31, 33, 34, 55

Mich. Admin. Code R. 336.2902(2)(c) ................................................ 32

Mich. Admin. Code R. 336.2902(5)(a) ................................... 8, 55, 56, 57

Mich. Admin. Code R. 336.2902(6) ............................................... 18, 62

Mich. Admin. Code R. 336.2902(6)(e) .................................................. 62

Mich. Admin. Code R. 336.2902(c) ................................................... 7, 31

Mich. Admin. Code R. 336.2902(d) ....................................................... 15

Mich. Admin. Code R. 336.2908(3) ................................................... 8, 55

**Other Authorities**

3 Fletcher Cyc. Corp. § 837.50 ........................................................... 70

63 Fed. Reg. 39857 (July 24, 1998) ...................................................... 50

78 Fed. Reg. 28,321 (May 16, 2008). ...................................................... 4

78 Fed. Reg. 76,064 (Dec. 16, 2013) ...................................................... 6

## STATEMENT REGARDING ORAL ARGUMENT

The United States believes that oral argument will assist the Court because this appeal presents complex legal issues and involves large summary judgment and trial records.

## INTRODUCTION

In 1977, Congress imposed state-of-the-art pollution control requirements on major new stationary sources of air pollution. Under the Clean Air Act, as amended, facilities like EES Coke's Zug Island coke plant are grandfathered in and need not get a state permit imposing these controls. But that exemption was not open ended: if the plant later undergoes a major modification—a change that increases air pollution above certain thresholds—a permit imposing strict controls under the act's "new source review" program must be obtained.

In 2012, Defendants made a business decision to burn only coke oven gas to heat the facility's coke ovens. The facility would no longer blend in blast furnace gas because that gas was beginning to damage—and could even destroy—the ovens. To accommodate this operational change without sacrificing coke production, Defendants requested that the Michigan permitting authority lift the limit on how much coke oven gas Defendants' facility could burn in its ovens. Defendants' request relied on projections about their future emissions after the change and their ability to sell much of the excess coke oven gas offsite to keep the facility's emissions down. Michigan granted Defendants' request in

2014 by issuing a new "permit to install" that permanently removed the limit. This change allowed Defendants to burn unlimited coke oven gas for coke production, generating more pollution as a result.

Defendants' projections of how much pollution would occur ultimately proved incorrect. Beginning in 2018, Defendants' actual emissions increased above the threshold that triggers major new source review requirements. And, under the undisputed evidence, at least 573 tons of excess sulfur dioxide was a direct byproduct of burning coke oven gas above the prior limit in 2018 alone. As the district court correctly concluded, Defendants would have had to reduce coke production—and thus emissions—but for the operational change.

The district court correctly concluded on summary judgment that EES Coke should have sought a New Source Review (NSR) permit because the 2014 permit and resulting emissions increases qualified as a major modification of the facility. Because the emissions that occurred would not have been possible without the 2014 change, the district court correctly concluded that the permit "resulted in" a major modification.

The district court also correctly rejected Defendants' statute of limitations defense. The United States' claims accrued when emissions first increased above significance thresholds in 2018. At minimum, Defendants were under continuing obligations that accrued when emissions increased that year.

Finally, the district court's findings after trial about corporate parent liability and the appropriate civil penalty were not clear error or an abuse of discretion.

This Court should affirm.

## STATEMENT OF THE ISSUES

1. Did the facility violate the NSR program by making a change that resulted in significantly higher emissions without getting an NSR permit?

2. Did the district court properly conclude the United States' claims were timely?

3. Did the district court correctly conclude that Defendants violated applicable reporting requirements?

4. Did the district court clearly err in finding certain of EES Coke's parent companies were "operators" of the facility?

5. Did the district court abuse its discretion in imposing a $100 million civil penalty?

## STATEMENT OF THE CASE

### I. Legal Background

#### A. The Clean Air Act

The Clean Air Act was enacted "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1). The Act directs EPA to promulgate National Ambient Air Quality Standards (NAAQS) for certain air pollutants. *Id.* § 7409; *see also, e.g.*, *Gen. Motors Corp. v. United States*, 496 U.S. 530, 533 (1990). NAAQS set limits on atmospheric concentrations of these pollutants over set timeframes. *See, e.g.*, 40 C.F.R. § 50.4. EPA has established NAAQS for sulfur oxides (with sulfur dioxide, or $SO_2$, as the indicator of the compounds' concentration), fine particulate matter (often called $PM_{2.5}$), and other pollutants. 40 C.F.R. §§ 50.2, 50.4, 50.5, 50.7. Sulfur dioxide is also a precursor to fine particulate matter. 73 Fed. Reg. 28,321, 28,327-28 (May 16, 2008).

The Clean Air Act directs the states, subject to EPA approval, to promulgate implementation plans (commonly called state

implementation plans or "SIPs") "for implementation, maintenance, and enforcement of" the NAAQS issued by EPA. 42 U.S.C. § 7410. SIPs impose, among other things, emission limitations, standards, and prohibitions on pollutants for which EPA has issued NAAQS. *See, e.g.*, Mich. Admin. Code. R. 336 pts. 3, 4. These rules are part of federal law and violations are enforceable by the United States on behalf of EPA. 42 U.S.C. § 7413(a)(1); *see Kentucky Res. Council, Inc. v. EPA*, 467 F.3d 986, 988 (6th Cir. 2006).

**B. New Source Review Program**

Congress created the NSR program in 1977. NSR's central premise is that nobody can build or expand a major source of air pollution without getting a permit and applying updated pollution controls. *See generally United States v. DTE Energy Co.* (*DTE I*), 711 F.3d 643, 644-45 (6th Cir. 2013). The precise provisions that apply depend on whether an area is in attainment with NAAQS or not for a specific pollutant. *See* 42 U.S.C. §§ 7475(a), 7503(a). At the relevant times, the area at issue in this case (Wayne County, Michigan) was in attainment for fine particulate matter and out of attainment for sulfur dioxide. Statement of Material Facts (SOF), R.E.159, PageID#5792;

SOF Resp., R.E.208, PageID#15105 (undisputed); *see DTE I*, 711 F.3d at 644 n.1 (noting similar overlap).

Under both sets of provisions, an NSR permit must be issued before construction commences and the facility must meet emissions limitations set out in the NSR permit that are based on emissions reductions achievable with state-of-the-art pollution control technology. 42 U.S.C. § 7475(a); 42 U.S.C. § 7479(3); *DTE I*, 711 F.3d at 645. These limits are called "best available control technology," or BACT, for attainment areas, and the "lowest achievable emissions rate," or LAER, for nonattainment areas. *Id.*; 42 U.S.C. §§ 7501(3), 7503(a)(2).

This case turns on whether Defendants made a "major modification" under the Clean Air Act with respect to sulfur dioxide and fine particulate matter (the latter through its sulfur dioxide emissions), triggering these major source NSR requirements. *See* 42 U.S.C. §§ 7475(a), 7479(2)(C), 7503. That question is governed by Michigan's SIP, discussed next. *See* 78 Fed. Reg. 76,064 (Dec. 16, 2013) (EPA approval of Michigan NSR rules).

### C. Michigan's SIP Provisions

Under Michigan's SIP, an NSR permit is required when a new source is constructed or when an existing source undergoes a change that increases emissions of one of several pollutants (i.e., a "modification"). Additional requirements apply if the source undergoes a change that increases emissions above specific thresholds (i.e., a "major modification"). *See* Mich. Admin. Code R. 336.2902. Before construction commences, facilities must compare a "baseline" period of actual emissions before the change being proposed to the projected actual emissions afterward. Mich. Admin. Code R. 336.2902(2)(b) and (c).

A change qualifies as a major modification for a specific pollutant if it is projected to cause a significant emissions increase and a significant net emissions increase for that pollutant. Mich. Admin. Code R. 336.2902(2)(b) and (c). "Regardless of any such preconstruction projections, a major modification results if the project causes a significant emissions increase and a significant net emissions increase." Mich. Admin. Code R. 336.2902(2)(b), 336.2802(4)(b).[1]

---

[1] It is undisputed that gross and net emissions are the same here. *See* SOF, R.E.159, PageID#5797; Resp., R.E.208, PageID#15108.

Michigan's SIP imposes a continuing obligation to comply with BACT and LAER if a major modification occurs. Mich. Admin. Code R. 336.2810(3), 336.2908(3). Finally, there is no permit shield: "[a]pproval to construct shall not relieve an owner or operator of the responsibility to comply fully with applicable provisions of the [SIP]." Mich. Admin. Code R. 336.2818(1), 336.2902(5)(a).

Certain emissions increases can be excluded under the so-called "demand-growth exclusion." Under Michigan's SIP, "in calculating any increase in emissions that results from the particular project," an operator can exclude "that portion of the unit's emissions following the project that" (1) "an existing unit could have accommodated" during the baseline, and (2) "are . . . unrelated to the particular project, including any increased utilization due to product demand growth." Mich. Admin. Code R. 336.2901(ee)(ii)(C); *see also United States v. DTE Energy Co.* (*DTE II*), 845 F.3d 735, 739 (6th Cir. 2017) (opinion of Daughtrey, J., in which Batchelder, J., joined in result).

These major source NSR provisions are separate from permitting requirements for minor sources or minor modifications to a major source. Those minor changes are usually covered by (as happened here

in 2014 for sulfur dioxide and fine particulate matter) "a permit to install." Mich. Admin. Code R. 336.1201(1).

**D. Other Relevant Provisions**

**Statute of Limitations.** The general provision for "an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture," 28 U.S.C. § 2462, applies to Clean Air Act enforcement suits. Enforcement actions for civil penalty subject to this provision "shall not be entertained unless commenced within five years from the date when the claim first accrued." *Id.*

**Operator Liability.** EPA can enforce violations of a SIP provisions against any "owner or operator of . . . a major stationary source." 42 U.S.C. § 7413(b). This includes "any person who owns, leases, operates, controls, or supervises a stationary source." *Id.* § 7411(a)(5).

**Civil Penalties under the Clean Air Act.** Civil penalties under the Clean Air Act are governed by 42 U.S.C. § 7413(e)(1). That provision lists seven statutory factors courts "shall take into consideration" along with other factors that "justice may require." 42 U.S.C. § 7413(e); *see also United States v. B&W Inv. Props.*, 38 F.3d 362, 368 (7th Cir. 1994).

## II. Factual Background

### A. Defendants' Zug Island Facility

Defendant EES Coke Battery, LLC, owns and operates a coke oven battery on Zug Island, River Rouge in Michigan, just south of Detroit. MSJ Op., R.E.331, PageID#24331. EES Coke is a wholly owned subsidiary of a holding company that is not a defendant here. *See* Pretrial Order, R.E.372, PageID#25714, 25721-22. That company is, in turn, wholly owned by DTE Energy Services, Inc. (DTEES). *Id.* DTEES is a subsidiary of DTE Energy Resources, LLC (DTEER), and DTEER is a subsidiary of DTE Energy Company (DTEEC). *Id.*[2]

The facility consists of a battery of 85 six-meter-tall ovens that produce blast furnace coke used in steel manufacturing. *Id.*; 2014 Permit App. (App.), R.E.168-9, PageID#9419-20. The ovens use "underfire combustion" to heat coal and convert it to blast furnace coke. *Id.* The underfire for the battery's ovens has historically burned a mixture of two types of fuels for normal operation: coke oven gas (COG)

---

[2] The district court found after trial that employees of the parent company defendants performed the permitting and compliance-related tasks discussed in this section, because EES Coke had none of its own employees. *See* Tr. Op., R.E.410, PageID#28616-23. We therefore refer to Defendants collectively.

and blast furnace gas (BFG). MSJ Op., R.E.331, PageID#24332; App., R.E.189-9, PageID#9420.

For emergencies, the facility maintains a separate system that allows it to keep the ovens hot using a compound derived from natural gas. Van Der Poel Dep., R.E.264-4, PageID#17520-21; Rule 30(b)(6) Dep., R.E.264-7, PageID#17555. In recent memory, the battery has used natural gas in this way only a handful of times, and for less than 12 hours each time. SOF, R.E.159, PageID#5794-95; Resp., R.E.208, PageID#15107 (not responding with dispute on this point); Rule 30(b)(6) Dep., R.E.286-2, PageID#20552-54. That system is not used for manufacturing coke because the facility is not designed for that. *Id.* PageID#20553.

The coal that the facility's ovens heat to create coke releases COG as a byproduct. App., R.E.168-9, PageID#9419-20. The facility captures the raw COG byproduct for processing. *Id.* After the raw COG is refined, some of it (the precise percentage fluctuates) is returned to the battery to fuel the underfire. *Id.* PageID#9420; *see also* Opening Br. 13 (showing percentage of COG returned to underfire). The facility prioritizes returning COG to the battery because it is the facility's

cheapest fuel option. *See* Van Der Poel Dep., RE.264-4, PageID#17525, 29.

The facility also sells COG to other facilities. App., R.E.168-9, PageID#9420. In the past, it sold mostly to U.S. Steel's neighboring steel manufacturing facility. *Id.* But U.S. Steel closed in 2020, so it no longer takes the gas. *See* SOF, R.E.159, PageID#5794; SOF Resp., R.E.208, PageID#15105. Any COG leftover is flared. *See* App., R.E.168-9, PageID#9420. Whether burned at the flare or underfire, COG emits sulfur dioxide into the atmosphere. *Id.*; MSJ Op., R.E.331, PageID#24332.

The original permit to install issued by the state agency now known as the Michigan Department of Environment, Great Lakes, and Energy (EGLE) in 1990 imposed a limit on the amount of COG that could be burned at the underfire: 2,850,000 million British thermal units (MMBtu) per year. MSJ Op., R.E.331, PageID#24332; App., R.E.168-9, PageID#9421. For a while, the facility operated under this limit and met its production needs, mixing COG with BFG for blends that contained between 15 and 90 percent BFG. *See* App., R.E.168-9, PageID#9421 (describing past operations). The facility's original permit

did not contain a limit on BFG combustion at the underfire, 1990 Permit, R.E.29-10, PageID#1428-30, and burning BFG results in far lower emissions of sulfur dioxide than burning COG does, *see* Operational Data, R.E.261-3, PageID#17134-36 (showing average sulfur content of COG and BFG).

In 2012, Defendants decided to permanently stop burning BFG altogether because it was damaging the facility's ovens and risked shortening their useful life. *Id.* PageID#9421. Because of the COG limit at that time, removing BFG from its mixture meant that total coke production—and emissions—dropped. Burnette Ltr., R.E.159-5, PageID#5835. To raise production levels back to what they had been before the facility stopped burning BFG, Defendants asked EGLE in May 2013 to suspend its underfire COG limit to "allow[] the full-time use of 100% COG." Temp. App., R.E.168-10, PageID#9640. In its application for this temporary reprieve, EES Coke indicated that it would also be applying to permanently remove the COG limit and asked that the temporary reprieve remain in effect "until final permit action is taken on the long-term permit, not to exceed one (1) year." *Id.* PageID#9640; MSJ Op., R.E.331, PageID#24333 (cleaned up).

### B. The 2014 Permit

In June 2014, Defendants asked EGLE to permanently relieve them of the permit's COG limit. App., R.E.168-9, PageID#9418-20. In their application, Defendants explained that since 2012, the facility had been running on 100% COG to prevent premature failure of the facility's ovens. *Id.* PageID#9421; MSJ Op., R.E.331, PageID#24333. The application explained that Defendants planned to use COG as the "primary fuel" for future operations and that the facility was "anticipated to operate on COG only." App., R.E.168-9, PageID#9450, 9453. Removing the COG limit was necessary "[t]o accommodate future production needs while operating on COG alone." *Id.* PageID#9421.

As part of their application, Defendants submitted a review of whether permanently removing the COG limit would result in a "major modification" triggering the NSR program. *Id.* PageID#9527-28. Defendants' analysis projected the facility's future emissions based on burning only COG at the facility going forward. *Id.* Defendants also submitted a business plan that projected that, each year going forward, EES Coke would sell 4,913,285 MMBtu/yr of COG for use offsite, including over 4 million MMBtu/year to U.S. Steel. Mourad Dec.,

R.E.168-3, PageID#9299-300. And Defendants projected that they would flare around 1.6 million MMBtu of COG given their projections for offsite sales and use in underfire combustion. *Id.*

Relying on the comparative methodology prescribed by Michigan's SIP, Defendants' application compared actual pre-project emissions with projected actual emissions after the project to see whether any increases would be significant.[3] *See* App., R.E.168-9, PageID#9451-55. For that comparison, Michigan's SIP allowed Defendants to select the 24-month "baseline period" for pre-project emissions against which projected post-project emissions would be compared. Mich. Admin. Code R. 336.2902(2)(b) and (c). In their application, Defendants selected the 24-month period from October 2011 to September 2013 for the pre-project baseline. EGLE Memo, R.E.168-16, PageID#9888; App., R.E.168-9, PageID#9449. Using this same baseline period, Defendants separately calculated emissions that, in their view, fit within the demand-growth exclusion. *See* App., R.E.168-9, PageID#9454.

---

[3] Michigan's SIP uses the phrase "projected actual" to distinguish from another method that compares actual pre-project emissions to "potential" post-project emissions. *See* Mich. Admin. Code R. 336.2902(d).

EGLE approved the permit application in November 2014. Permit, R.E.168-8, PageID#9372; EGLE Memo, R.E.168-16, PageID#9888. In addition to removing the COG limit permanently, the 2014 permit also increased annual coal throughput and sulfur dioxide underfire emissions limits. App., R.E.168-9, PageID#9421-22; Opening Br. 11. Since the 2014 permit's issuance, the facility has burned only COG for coke production. SOF, R.E.159, PageID#5794; SOF Resp., R.E.208, PageID#15105 (undisputed).

### C. The Facility's Emissions Increases

Defendants' projections for future COG sales and facility emissions ultimately proved inaccurate. Even though U.S. Steel had been trending downward since 2011, averaging 3.6 million MMBtu of COG per year between October 2011 and September 2013, Defendants had projected in their permit application that U.S. Steel would purchase over 4 million MMBtu going forward. Mourad Dec., R.E.168-3, PageID#9299-300; Fanning Dec., R.E.168-4, PageID#9331. That turned out to be way off. In 2016, for example, U.S. Steel ordered only 1,393,535 MMBtu of COG. Fanning Dec., R.E.168-4, PageID#9331.

Likewise, between 2017 and 2021, U.S. Steel ordered between 1.1 and 1.8 million MMBtu per year. *Id.*

EES Coke's emissions did not increase right away, however, when U.S. Steel's demand dropped. But that was only because the facility manufactured far less coke and thus produced less COG in 2016 than it had leading up to that point. In 2016, the facility produced about 5.2 million MMBtu of COG whereas in 2015, it had generated over 9 million MMBtu of COG. Fanning Dec., R.E.168-4, PageID#9331. Indeed, in 2016, COG combustion at the underfire was below the prior COG limit. *See id.* Production rebounded in 2017, and, by 2018, the facility was generating more COG than it had since the 2014 permit was issued. *Id.* With U.S. Steel making around a quarter of the purchases Defendants had projected in their 2014 permit application, Defendants burned more COG at the facility than ever before. *Id.*

Rather than reduce coke production to reduce the resulting COG byproduct, the facility continued to ramp up coke production. *See id.* In 2018, the facility generated a total of over 9.5 million MMBtu of COG, the highest amount generated since 2011. *Id.* Emissions increased as a result, and at least 573 tons of excess emissions of sulfur dioxide in

2018 resulted from COG burned at the underfire above the previous permit's COG limit (the significance threshold for sulfur dioxide is 40 tons both in and of itself and as an indicator of fine particulate matter emissions). Resp. to Interrog., R.E.159-11, PageID#5891-96; *see* Mich. Admin. Code R. 336.2801(qq), 336.2901(hh). The facility similarly exceeded significance thresholds in 2019 and 2021, among other times. *Id.*

After an investigation, EPA issued a notice of violation to EES Coke on September 16, 2020. SOF, R.E.159, PageID#5800; Resp., R.E.208, PageID#15105. Defendants did not curb their emissions after receiving EPA's notice of violation. Tr. Op., R.E.410, PageID#28634.[4]

## III. Procedural History

### A. The Suit

The United States filed suit in June 2022, alleging that EES Coke violated the Clean Air Act by: (1) undertaking a major modification without complying with the NSR program, and (2) failing to comply with reporting requirements that apply when there is a "reasonable

---

[4] A tolling agreement in place from September 1, 2019 through June 30, 2022, means that timeframe does not count against the relevant limitations period. *See* Opening Br. 39.

possibility" that a source will experience significant increases in emissions from a change to an existing unit, *see* Mich. Admin. Code R. 336.2902(6). Compl., R.E.1, PageID#17-19. Sierra Club and the City of River Rouge intervened as plaintiffs later in 2022. Intervenors' Order, RE.38, PageID#2641-43.

The United States sought leave to amend its complaint to add three of EES Coke's corporate parents, DTEES, DTEER, and DTEEC, based on newly discovered information about those companies' roles in decisions underlying the facility's emissions increases. Mot. to Am., R.E.77, PageID#3262-63. In granting leave, the district court rejected Defendants' arguments that the United States' claims were barred by the five-year statute of limitations. Order Granting Leave, R.E.90, PageID#3806-09. The district court applied this Court's decision in *National Parks Conservation Ass'n, Inc. v. TVA*, 480 F.3d 410, 418-19 (6th Cir. 2007), which held that language in Tennessee's SIP (nearly identical to the Michigan SIP on this point) created "an ongoing obligation to apply BACT" and get a permit. *See* Order Granting Leave, R.E.90, PageID#3807. Based on this language, the "cause of action manifests itself anew each day." *Nat'l Parks*, 480 F.3d at 419.

### B. Summary Judgment

After discovery and as trial approached, both sides filed summary judgment motions.[5] The United States moved for summary judgment solely on EES Coke's liability (but not on the parent company defendants' liability) for NSR and reporting violations. U.S. MSJ, R.E.159, PageID#5776-77.

EES Coke moved for summary judgment on liability, including its statute-of-limitations defense. EES Coke MSJ, R.E.168, PageID#9235-41. For that argument, EES Coke asserted that the United States' claims accrued when EES Coke was first allowed to exceed the preexisting COG limit in 2013 through the temporary permit that was in effect until November 2014, when the permanent change was approved. *Id.* PageID#9267-69. EES Coke's corporate parents joined EES Coke's motion but also filed a separate summary judgment motion asserting they are not liable because they are not "operators" of the facility. Parents' MSJ, R.E.169, PageID#9979-80. Sierra Club also

[5] The court had previously denied the United States' motion for partial summary judgment in 2022 on liability to allow for discovery. Order, R.E.60, PageID#3040.

moved for summary judgment on several issues. Int. MSJ, R.E.162, PageID#5997-98.

The district court granted summary judgment for the government on EES Coke's liability and denied the other parties' motions. MSJ Op., R.E.331, PageID#24365. Relevant here, the district court concluded that (1) under the undisputed facts, "the 2014 [p]ermit allowed EES Coke to burn more COG at underfire, and EES Coke did just that, resulting in a significant emissions increase," and (2) EES Coke's emissions did not qualify for exclusion under the demand-growth exclusion, on which a defendant bears the burden of proof. *Id.* PageID#24345-49. EES Coke was therefore liable as a matter of law on the United States' claim for violating the NSR permit requirement. *Id.* PageID#24349-50. And EES Coke was separately liable for failure to comply with "reasonable possibility" reporting requirements. *Id.* PageID#24351-52.

Addressing Defendants' cross-motions, the district court denied summary judgment for EES Coke on statute-of-limitations grounds, reiterating its earlier decision on the pleadings. *See id.* PageID#24354-55. Finally, the district court determined that there was evidence

supporting the government's claim that EES Coke's corporate parents were "operators" under the Clean Air Act, and it held that the corporate parent defendants were therefore not entitled to summary judgment on liability. *Id.* PageID#324355-24362.

### C. Trial

With liability for EES Coke established as a matter of law, the court conducted a two-week bench trial in September 2025 on two issues: the corporate parents' "operator" liability and the appropriate remedies. Tr. Op., R.E.410, PageID#28615. After trial, the court issued written findings and conclusions. *Id.* PageID#28605-56.

On corporate-parent liability, the district court made findings about the various roles of employees of EES Coke's parent companies under the test from *United States v. Bestfoods*, 524 U.S. 51, 62 (1998). *See id.* PageID#28624-27. The court found that EES Coke had no employees of its own and did not even have its own bank account. *Id.* PageID#28616, 28630. Rather, EES Coke's parent DTEEC held all its cash and made all decisions about its spending. *Id.* PageID#28616. These facts, combined with the pervasive management by employees of EES Coke's parent companies, led the district court to find that these

parent companies' control over "the Facility's operations is eccentric under accepted norms of parental oversight over a subsidiary," and "goes well beyond what is consistent with a parent company's investor status." *Id.* PageID#28631. Accordingly, the district court held the three parent company defendants liable as operators under the Act. *Id.* PageID#28631-32.

In evaluating the appropriate civil penalty to impose for Defendants' NSR violation, the district court considered the statutory factors listed in 42 U.S.C. § 7413(e)(1). *See* Tr. Op., R.E.410, PageID#28632-38. The court first calculated the maximum statutory penalty for Defendants' NSR violation at $304,843,700. *Id.* PageID#28632. After weighing the competing evidence on the central factor of economic benefit, the court credited the United States' expert, who calculated a range of economic benefit of between approximately $47 million and $99.1 million, depending on the metric used. *Id.* PageID#28633. The court made findings about each Defendant's ability to pay and EES Coke's continued excess emissions after receiving EPA's notice of violation in September 2020. *Id.* PageID#28633-34. Based on these findings, the district court imposed a $100 million penalty for the

principal NSR violation. The Court separately imposed a penalty of $1 for Defendants' violation of "reasonable possibility" reporting requirements. *Id.* PageID#28638.

Defendants timely appealed. Notice of Appeal, R.E.418, PageID#28718-20.

## SUMMARY OF THE ARGUMENT

**I.** The district court correctly held on summary judgment that the 2014 permit resulted in a major modification triggering NSR requirements, that the United States' claims were timely, and that Defendants violated their reporting obligations under the Michigan SIP.

**1.** The 2014 permit resulted in a major modification.

**a.** The district court correctly concluded that the 2014 permit's permanent removal of the underfire COG limit resulted in significant emissions increases. Under Michigan's SIP, the causation inquiry compares actual post-change emissions to the facility's pre-change baseline. By 2018, the facility's actual sulfur-dioxide emissions exceeded that baseline and exceeded what EGLE found could have been accommodated during the baseline period, both well over the threshold for significance. Under Michigan's SIP, these actual increases are

determinative "[r]egardless of" pre-construction projections. The district court thus correctly held that the 2014 permit's removal of the underfire COG limit resulted in a major modification.

**b.** Defendants cannot avoid this straightforward result by speculating about alternative fuels they could have used had the permit been denied or by pointing to a drop in demand for COG. Michigan's SIP requires a comparison of *actual* emissions, not theoretical ones. Nor do basic principles of causation support Defendants' speculation about alternative fuels, because removing the COG limit is still a but-for cause of emissions increases even if it "combines with other factors to produce the result, so long as the other factors alone would not have done so." *Burrage v. United States*, 571 U.S. 204, 211 (2014). Whatever Defendants believe about what they might have done in an alternative world without the 2014 permit, the undisputed summary judgment evidence shows that the emissions that actually occurred would not have been possible without the permit.

**c.** Defendants are wrong that there are genuine disputes of fact about what fuel they would have burned absent the COG limit's removal. EES Coke's own permit application to EGLE represented that

its goal was to replace other gases “with the *exclusive use* of Coke Oven Gas.” Defs.’ Cmts. re Permit, R.E.228-1, PageID#16445 (emphasis added). It is undisputed that Defendants stopped burning BFG even before the permit modification, at the expense of the facility’s coke production volume. It is likewise undisputed that Defendants have never used natural gas for coke production and that the facility is not designed to. None of Defendants’ summary judgment evidence overcomes Defendants’ statements to EGLE and what they have actually done.

**d.** Defendants’ new proximate cause arguments are both forfeited and wrong. Defendants did not raise the argument at summary judgment. That proximate cause is sometimes considered the “default” rule in other contexts does not change the relevant statutory and regulatory provisions’ plain text. That text requires proof only that a change “results in” a major modification. The Supreme Court has held that nearly identical language “imposes . . . a requirement of actual causality,” or but-for causation. *Burrage v. United States*, 571 U.S. at 210-11. Proximate cause does not apply here.

**2.** The United States' claims are timely. Under Michigan's SIP, those claims first accrued when emissions increased above the threshold for a major modification in 2018. Alternatively, the claims "manifest[] [themselves] anew each day" under this Court's precedent interpreting functionally identical SIP provisions. *Nat'l Parks Cons. Ass'n v. TVA*, 480 F.3d at 419. But even under Defendants' theory that claims are triggered only once on the first day of operations after failing to get a permit, the United States' claim accrued after September 1, 2014, the date Defendants say is the cutoff. *See* Opening Br. 39. Defendants' timeliness argument is premised on the claims accruing in 2013 instead of November 2014, when the COG-limit was permanently removed in the 2014 permit. That premise is incorrect because the 2014 permit was distinct from the 2013 temporary reprieve and, as the district court concluded, was the actual cause of emissions increases beginning in 2018. Under any theory, the United States' claims are timely.

**3.** Defendants violated their reporting obligations as a matter of law. After trial, the district court imposed a penalty of $1.00 for Defendants' violation of a Michigan SIP requirement to keep records

and report certain emissions increases if there is a "reasonable possibility" that the project could later result in significant emissions increases. Tr. Op., R.E.410, PageID#28638. And at summary judgment, the district court correctly concluded that Defendants undisputedly missed the deadlines. Defendants never raised their new "fair notice" arguments at summary judgment, and those arguments fail anyway.

**II.** Following trial, the district court made well-supported factual findings underpinning its determination that the corporate parent defendants are liable as operators under the Clean Air Act, it imposed a civil penalty within its sound discretion, and it issued an injunction requiring Defendants to comply with the NSR program. This Court should affirm.

**1.** The district court did not clearly err in determining that the corporate parent defendants are liable as operators under the Clean Air Act. Defendants do not attempt to show clear error, and their nit-picking of the district court's factual findings fails.

**2.** The district court acted within its sound discretion by imposing a $100 million civil penalty for Defendants' NSR violation. It considered the pertinent statutory factors, appropriately weighing the

economic benefit to Defendants. The court applied no per se rules or legal "floor" in its penalty calculation, but instead reasonably determined that a significant penalty was warranted to deter future violations, among other factors.

**3.** Finally, the district court properly granted an injunction requiring Defendants to comply with the NSR program. Defendants never raised their newfound concurrent remedies doctrine argument, and that doctrine does not apply to the United States in any event.

This Court should affirm.

## STANDARD OF REVIEW

This Court reviews a grant of summary judgment de novo. *Hirsch v. CSX Transp.*, Inc., 656 F.3d 359, 362 (6th Cir. 2011). Summary judgment is appropriate if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "To survive summary judgment, the mere existence of a scintilla of evidence in support of a party's position will not suffice." *Hirsch*, 656 F.3d at 362 (cleaned up). Absent factual support, no genuine dispute exists for trial. *Id.*

"In an appeal from a judgment entered after a bench trial, [this Court] review[s] the district court's findings of fact for clear error and its conclusions of law de novo." *T. Marzetti Co. v. Roskam Baking Co.*, 680 F.3d 629, 633 (6th Cir. 2012). The standard of review for a mixed question of law and fact "all depends on whether answering it entails primarily legal or factual work." *Am. Premier Underwriters, Inc. v. Gen. Elec. Co.*, 14 F.4th 560, 568 (6th Cir. 2021) (quoting *U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 583 U.S. 387, 397 (2018)).

## ARGUMENT

### I. The district court correctly granted summary judgment for the United States.

The district court correctly granted summary judgment for the United States on liability because the undisputed facts establish that, for claim one, the COG-limit's permanent removal resulted in a major modification. And, for claim two, the undisputed facts establish a failure to timely report. The court likewise correctly denied summary judgment on Defendants' statute of limitations defense.

### A. Permanently removing the underfire COG limit resulted in significantly higher emissions and therefore triggered major source NSR.

The undisputed facts establish that permanently removing the COG limit through the 2014 permit is a but-for cause of the facility's significant increase in emissions beginning in 2018. The district court thus correctly granted summary judgment for the government on EES Coke's liability for a violation of the NSR program. Defendants' contrary arguments fail on both the law and the undisputed facts.

#### 1. There is no dispute that permanently removing the underfire COG limit resulted in significantly higher emissions of sulfur dioxide and fine particulate matter.

Michigan's SIP provides that a facility violates the Clean Air Act when a change to the facility results in—or causes—significant emissions increases without an NSR permit. Mich. Admin. Code R. 336.2802(4)(b); 336.2902(2)(b). That is the case "[r]egardless of" Defendants' pre-construction projections. *Id.* Defendants agree that these regulations mean that "a facility's pre-change projections are not dispositive." Opening Br. 7. The district court correctly concluded that Defendants' actual emissions exceeded the relevant significance

thresholds and that those exceedances were caused by the COG-limit's permanent removal. MSJ Op., R.E.331, PageID#24343-47.

These conclusions flow from the way increases are calculated under Michigan's SIP. As Defendants acknowledge (Opening Br. 6), the "actual-to-projected-actual" test—which compares actual emissions during the baseline period to emissions projected to occur after the change—applied when Defendants submitted their permit application. Mich. Admin. Code R. 336.2802(4)(c), 336.2902(2)(c). Under that test, the regulations require comparing "the difference between the projected actual emissions and the baseline actual emissions." *Id.* In their application and in the district court, Defendants identified their "baseline actual emissions" using an average of their emissions over the period of October 2011-September 2013. Opening Br. 29 n.3; EGLE Memo, R.E.168-16, PageID#9888; *see* Mich. Admin. Code R. 336.2801(b)(ii), 336.2901(b)(ii).

It is undisputed that for sulfur dioxide (and, derivatively, fine particulate matter), Defendants and EGLE relied on a "baseline actual emissions" figure of 2,039 tons per year. Mourad Dec., R.E.168-3, PageID#9288; SOF Resp., R.E.208, PageID#15110. EGLE determined

that comparing these baseline emissions to projected emissions—after subtracting emissions within the demand-growth exclusion as calculated in Defendants' application—meant no major modification was projected to occur as of 2014, when Defendants secured the permit change. *See id.*[6]

Now that emissions have occurred, however, that same "baseline" figure must be compared against actual emissions, not projected emissions. That is so because "a major modification results if the project causes a significant emissions increase" "[r]egardless of" the projections Defendants and EGLE used. Mich. Admin. Code R. 336.2802(4)(b); 336.2902(2)(b). In 2018, the facility emitted 3,273 tons of sulfur dioxide. *See* Mourad Dec., R.E.168-3, PageID#9300; *see* SOF, R.E.159, PageID#5798; SOF Resp., R.E.208, PageID#15110 (not contesting this point). As Defendants' own evidence reflected, this actual emissions figure for 2018 "exceeded the projection of 3,103 tons" for post-change emissions, Mourad Dec., R.E.168-3, PageID#9300, and it exceeded what

---

[6] Defendants' appellate brief relies on a different baseline (calendar years 2010 and 2011) from their application to EGLE. As discussed later, Defendants cannot shift their baseline at this stage. *See infra* pp.46-47,

EGLE determined the facility could accommodate before the change by 145 tons, Galinsky Dec., R.E.168-5, PageID#9354-56; SOF, R.E.159, PageID#5798; SOF Resp., R.E.208, PageID#15110 (not contesting this point). That difference exceeds the 40-ton significance threshold for sulfur dioxide and fine particulate matter. *See* Mich. Admin. Code R. 336.2801(qq), 336.2901(hh). Defendants' emissions exceeded the threshold again in 2019, 2021, and several other 12-month periods. Resp. to Interrog., R.E.159-11, PageID#5891-96; *see* MSJ Op., R.E.331, PageID#24343, 24352.

Permanently removing the COG limit resulted in these increases. Taking 2018 again, the facility burned a total of 4,036,720 MMBtu, which Defendants "admitted" was "higher than the prior underfire limit of 2,850,000" MMBtu per year. Resp. to Interrog., R.E.262-15, PageID#17431. That excess COG, when burned, released at least 573 tons of additional sulfur dioxide into the air. Resp. to Interrog., R.E.159-11, PageID#5891-96. It is thus undisputed that, in 2018, permanently removing the COG limit resulted in significantly increased sulfur dioxide emissions. *See* Mich. Admin. Code R. 336.2802(4)(b); 336.2902(2)(b). The same is true for several other later periods. *See*

Resp. to Interrog., R.E.159-11, PageID#5891-96. Nothing more is required.

#### 2. Defendants' arguments about what might have happened without the COG-limit's permanent removal are irrelevant.

The district court correctly deemed Defendants' arguments about how they might have heated their ovens and where they might have sent COG absent the COG-limit's permanent removal irrelevant to the causation inquiry. As the court explained, "the 2014 [p]ermit allowed EES Coke to burn more COG at underfire, and EES Coke did just that, resulting in a significant emissions increase." *Id.* PageID#24346. It did not matter that, as Defendants argued, the facility "*might* have" sent excess COG to the flare and burned more BFG instead. *Id.* And it did not matter "why" the facility burned more COG—because, in Defendants' telling, the neighboring U.S. Steel facility purchased less. *Id.* 22-23. Factually, there is simply no dispute that permanently removing the COG limit caused the emissions increases that actually occurred. And that is the only relevant question under Michigan's SIP. *See* Mich. Admin. Code R. 336.2802(4)(b); 336.2902(2).

Among other problems (like an absence of supporting evidence, discussed in the next section), Defendants' arguments about but-for causation (Opening Br. 24-34) rely on hypotheticals about what they might have done had the COG limit remained in place. *See, e.g.*, Opening Br. 31. But what Defendants might have done in counterfactual scenarios Defendants posit is not a part of the but-for cause inquiry—what they actually *did* is what matters. After all, but-for cause exists if "the harm would not have occurred in the absence of—that is, but for—the defendant's conduct." *Burrage v. United States*, 571 U.S. at 210 (cleaned up). The harm here is the undisputed significant emissions increase. And the conduct here is burning COG above the preexisting limit. Removing that conduct—i.e., keeping COG combustion at or below the preexisting COG limit—prevents 573 tons of excess sulfur dioxide emissions for 2018 alone.

Indeed, the "predicate act" here—removing the COG limit—is still a but-for cause of emissions increases even if it "combines with other factors to produce the result, so long as the other factors alone would not have done so." *Burrage*, 571 U.S. at 211. To use the Supreme Court's analogy in *Burrage*, a leadoff batter's home run is the but-for

cause of victory if the batter's team "goes on to win by a score of 1 to 0." 571 U.S. at 211-12. "It is beside the point that the victory also resulted from a host of other necessary causes, such as skillful pitching, the coach's decision to put the leadoff batter in the lineup, and the league's decision to schedule the game." *Id.* at 212. Burning COG at the underfire above the preexisting limit is the leadoff batter here, because the emissions increases triggering a major modification would not have occurred without that predicate.

Defendants' arguments about where they would have sent the COG absent the COG-limit's permanent removal are even further afield from the "host of other necessary causes" that the Supreme Court said were insufficient to overcome but-for causation. *Id.* at 212. Defendants say that if their permit application had been denied, external market forces still would have led to a drop in outside purchases for COG. *See* Opening Br. 29. Thus, "[i]f" Defendants nonetheless "produc[ed] the same amount of COG," Defendants say, "emissions would have been the same." Opening Br. 30. That is a big "if" because it assumes alternative fuels are available when, as discussed in the next section, none are.

In any event, it should not matter that Defendants think they could have generated the same amount of pollution by making other changes to their operations. That is like asking what would have happened if the leadoff batter never showed up to the game in the Supreme Court's hypothetical in *Burrage*. *See* 571 U.S. at 211-12. Maybe the coach would have tapped an untested rookie to take the batter's place in the lineup, and maybe the rookie would have hit a homerun, too. But, even more than the "host of other necessary causes" that the Supreme Court said did not overcome the leadoff batter's place as a but-for cause, *id.*, this kind of hypothetical has no place in the but-for cause inquiry.

Michigan's SIP confirms as much. It requires a comparison of *actual* emissions, not hypothetical ones. *See* Mich. Admin. Code R. 336.2802(4)(b); 336.2902(2). And Michigan's SIP provisions about when unrelated emissions increases caused by outside economic factors—the demand-growth exclusion—reinforce that outside factors like U.S. Steel's demand and what Defendants might have done absent the COG-limit's permanent removal have no bearing on the initial causation inquiry. *See* Mich. Admin. Code R. 336.2901(ee)(ii)(C). Under those

provisions, an operator can exclude from its emissions calculation certain emissions resulting from increased utilization unrelated to the modification at issue. *Id.* But Defendants bear the burden of establishing any emissions exclusions. *See United States v. Ameren Missouri*, 9 F.4th 989, 1005 (8th Cir. 2021); *DTE II*, 845 F.3d at 739 (opinion in which Batchelder, J., joined in result). Even then, the exclusion only applies if the emissions "are . . . unrelated to the" change. Mich. Admin. Code R. 336.2901(ee)(ii)(C).

The district court correctly concluded that Defendants failed to show that its emissions increases were "unrelated," MSJ Op., R.E.331, PageID#24347-49, and Defendants do not challenge this determination on appeal. *See* Opening Br. 24-38. Indeed, Defendants hardly talk about the demand-growth exclusion at all on appeal. *See* Opening Br. 7. But, in ignoring the exclusion, Defendants elide what its provisions make clear: Defendants' counterfactuals about how they could theoretically have maintained production levels and accommodated their later emissions increases absent the COG-limit's permanent removal are irrelevant to the but-for cause inquiry. To conclude otherwise would

mean that the but-for cause inquiry subsumes the separate provisions for the demand-growth exclusion, contrary to the SIP's plain text.

The district court correctly concluded that Defendants' hypotheticals about how they would have handled excess COG absent the COG-limit's permanent removal are irrelevant to but-for causation. This Court should do the same.

**3. There is no genuine dispute that Defendants considered COG the sole viable fuel for the facility's ovens.**

Defendants' arguments also fail on their own terms. Defendants contend (*e.g.*, Opening Br. 33-35) that they could have burned BFG or natural gas instead and the district court thus erred in concluding that the facility would have been forced to cut production without the 2014 permit, *see* MSJ Op, R.E.331, PageID#24346-47. But there is no *genuine* dispute that, even without the 2014 permit's permanent removal of the COG limit, Defendants were only going to burn COG.

Defendants' told EGLE that they intended to replace other gases "with the *exclusive use* of Coke Oven Gas." Defs.' Cmts. re Permit, R.E.228-1, PageID#16445 (emphasis added). Indeed, Defendants stopped using BFG, the only other primary fuel it had ever used at the

facility, in 2012—two years before the 2014 permit was issued. SOF, R.E.159, PageID#5793-94; SOF Resp., R.E., 208, PageID#15106-07 (not contesting these points); Burnette Ltr., R.E.159-5, PageID#5834. Defendants explained to EGLE that BFG was no longer an "available fuel source" and that COG was their "sole remaining fuel source." Burnette Ltr., R.E.159-5, PageID#5834. To meet production needs for coke while using solely COG, Defendants needed the COG limit removed. App., R.E.168-9, PageID#9421.

Defendants' rationale for this change was clear: continuing to burn BFG "had caused corrosion that compromised the structural integrity of" certain sections of many coke ovens, "resulting in the potential for catastrophic failure of the equipment." Burnette Ltr., R.E.159-5, PageID#5834. Indeed, Defendants "discontinued the use of all [BFG] in July 2012 because such use threatened plant safety, as well as the continued existence of the coke battery itself." *Id.* That is why, since 2012, the facility had been running on 100% COG. *Id.* PageID#9421; MSJ Op., R.E.331, PageID#24333.

EES Coke is incorrect (Opening Br. 31) that its ability to burn other fuels is in genuine dispute. A dispute of fact is genuine only "if a

reasonable factfinder could resolve it either way." *Jordan v. Howard*, 987 F.3d 537, 542 (6th Cir. 2021). Evidence that is "merely colorable" or "not significantly probative" is insufficient. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (2021). Defendants say that their evidence below showed "that EES Coke could have burned other fuels at the underfire, including BFG or natural gas, to maintain production levels." Opening Br. 34. As already discussed, what EES Coke "could have" done is irrelevant. But in any event, Defendants' evidence does not create a genuine dispute on the issue.

With respect to BFG, none of Defendants' evidence overcomes the undisputed fact that Defendants (1) stopped using BFG *before* their permit change, and (2) told the state regulator that COG was their "sole remaining fuel source." SOF, R.E.159, PageID#5793-94; SOF Resp., R.E., 208, PageID#15106-07 (not contesting these points); Burnette Ltr., R.E.159-5, PageID#5834. EGLE's entire permit action was premised on the idea that EES Coke would "only combust COG" going forward, and EGLE even removed a preexisting emissions limit on carbon monoxide that results from burning BFG on the understanding that the facility would use only COG going forward. *See* EGLE Memo, R.E.168-16,

PageID#9896. EGLE even allowed an increase in coal throughput based on the change. App., R.E.168-9, PageID#9421-22; Opening Br. 11.

Defendants' fact witness David Fanning testified that BFG poses "a long-term risk" to the facility's coke ovens, so EES Coke elected to stop using BFG immediately without trying "to figure out how long [it] could get away with" doing so. PageID#17490. Rather, "the only logical conclusion was to not use that heating system." *Id.* PageID#17491; *see also* Burnette Ltr., R.E.159-5, PageID#5834.

And Fadi Mourad, the only other fact witness Defendants reference for this point, testified only that an "alternative fuel . . . *could* have been explored and approved," Mourad Dep., R.E.264-5, PageID#17540-41 (emphasis added). Mourad also testified that without COG, the company "may" end up "looking at blast furnace gas and what can be done there, if at all, to continue potentially using it." *Id.* PageID#17541. Nothing here raises a genuine dispute about Defendants' central representation to EGLE that it would use only COG to fuel their coke ovens going forward. Indeed, that is exactly what they did.

Defendants make much (Opening Br. 34) of their permitting expert Colin Campbell's statement in his report that "EES Coke remained both physically and legally capable of continuing to operate the battery at normal levels of utilization while using both COG and BFG to meet its energy needs." Campbell Report, R.E.261-1, PageID#17073. But Campbell admitted at his deposition that his conclusion was based on "an engineering analysis, constrained only by enforceable restrictions." PageID#17577. In other words, it ignored the reality just discussed: that Defendants had already decided to stop using BFG and to use COG as their "sole remaining fuel source." SOF, R.E.159, PageID#5793-94; SOF Resp., R.E., 208, PageID#15106-07; Burnette Ltr., R.E.159-5, PageID#5834. Relying on the facility's theoretical ability to use BFG does not contradict the undisputed evidence that EES Coke had already stopped using BFG and told EGLE that change was permanent. And even if the facility could have used BFG in the past, U.S. Steel closed in 2020, leaving Defendants' facility without access to it. SOF, R.E.159, PageID#5794; Resp., R.E.208, PageID#15105 (undisputed).

The possibility of using natural gas is even more speculative because Defendants' facility is not designed to operate on natural gas. Rule 30(b)(6) Dep., R.E.286-2, PageID#20553. Although Fanning testified that synthetic COG made with natural gas was one of two options available—the other being COG, the actual sole fuel source for the battery since 2012—he explained that the work to determine an alternative fuel source was never done. PageID#17494. And Mourad's testimony on the subject simply assumed without examination that an alternative fuel like BFG or natural gas "could have been explored and approved." PageID#17540-41, *see id.* PageID#17544.

Meanwhile, an expert Defendants rely on (Opening Br. 34), Philippe van der Poel, admitted that he never spoke to anyone about using natural gas as the "prime fuel." Van Der Poel Dep., RE.264-4, PageID#17523-24. Indeed, as this expert testified, natural gas is typically used for startup "when there is no [COG] available." *Id.* Once ovens are started, COG is produced as a by-product. COG is thus free, whereas "you have to pay" for natural gas. PageID#17529. As a result, natural gas could theoretically be a fuel source for normal operations only "[i]f you completely ignore the economic[] viability of this proposal."

PageID#17525; *see also* PageID#17529-30 (explaining that "it just makes more sense economically to use" COG). Other testimony confirms that natural gas is for emergencies, not for normal operations. Rule 30(b)(6) Dep., R.E.264-7, PageID#17555.

None of Defendants' evidence raises a genuine dispute about Defendants' intentions: they never planned to use a fuel other than COG again for regular operations. Indeed, Defendants have used only COG since 2012, just like they told EGLE they would. It is these COG-based operations that resulted in excess emissions. And those operations were only possible because of the COG-limit's permanent removal.

These undisputed facts make quick work of Defendants' remaining but-for cause arguments. To start, Defendants are incorrect (Opening Br. 31-33) that the district court relied on the wrong comparison. The district court compared actual emissions from the baseline period to actual emissions after the change. *See* MSJ Op., PageID#24343. That is plainly correct. *See supra* pp.7, 15, 33. Defendants assert that "[i]n the 2010-2011 baseline period, the Facility produced more coke and more COG than after the 2014 [p]ermit, and it

did so with the pre-2014 underfire COG combustion limit in place." Opening Br. 32. But this relies on a forfeited argument. In district court and in their EGLE application, Defendants selected October 2011-September 2013 as the baseline. Opening Br. 29 n.3; EGLE Memo, R.E.168-16, PageID#9888. During that period, Defendants stopped using BFG, and production and emissions decreased. Burnette Ltr., R.E.159-5, PageID#5835. Defendants cannot fault the district court for relying on a baseline period that they provided. *See Harvis v. Roadway Exp. Inc.*, 923 F.2d 59, 60 (6th Cir. 1991) ("[A] party may not complain on appeal of errors that he himself invited or provoked the court or the opposite party to commit.").

Defendants posit a hypothetical involving replacing a gauge "identical with respect to emissions" and then increasing production. *See* Opening Br. 32. But the better analogy here would be replacing a gauge that has already failed with a new one that results in more emissions and higher production. That is exactly what Defendants told EGLE: they needed the COG-limit removed "[t]o accommodate future production needs while operating on COG alone." R.E.168-9, PageID#9421.

Defendants assert that (Opening Br. 30-32), without the COG limit's permanent removal, the facility would have simply flared excess COG instead of using it productively at the underfire. But that conjecture assumes the facility could keep production levels constant even with the COG limit in place. After all, another fuel would be required to heat the ovens if COG combustion were limited. And yet, again, Defendants had already elected to use only COG going forward. Indeed, as Defendants' expert explained, using COG at the underfire is the most economical production method because it is a free byproduct of the coking process. Van Der Poel Dep., RE.264-4, PageID#17525, 29. Without another fuel to substitute for COG, the facility would have been forced to reduce production to comply with the preexisting COG limit.

#### 4. Defendants' newfound proximate cause arguments are forfeited and incorrect.

Defendants assert that a change must also be the proximate cause for any resulting emissions to be a major modification. Defendants did not raise this argument during summary judgment proceedings and never attempted to frame their factual arguments as relating to proximate cause. *See, e.g.*, Order on Cert. Interlocutory Appeal,

R.E.369, PageID#25680 (noting, in denying certification of interlocutory appeal, that defendants never raised proximate cause argument during summary judgment). A party "has forfeited an argument when the party belatedly asserts it on appeal after having failed to raise it in the district court." *Bannister v. Knox Cnty. Bd. of Educ.*, 49 F.4th 1000, 1011 (6th Cir. 2022). This Court has held that new summary judgment theories are forfeited on appeal if not raised below. *See Ohio State Univ. v. Redbubble, Inc.*, 989 F.3d 435, 443 (6th Cir. 2021). Having failed to raise their proximate cause theory during summary judgment proceedings, Defendants' argument is forfeited. This Court can reject Defendants' proximate cause arguments on this basis alone.

The argument also fails on its own terms. The relevant provisions define a "modification" as a change that, as relevant here, "results in" emissions changes. 42 U.S.C. § 7411(a)(4); *see also* Mich. Admin. Code R. 336.2902(2). In *Burrage*, the Supreme Court held that the ordinary meaning of a similar phrase—"results from"—"imposes . . . a requirement of actual causality." 571 U.S. at, 210-11. The phrase "requires proof that the harm would not have occurred in the absence of—that is, but for—the defendant's conduct." *Id.* at 211.

This Court has previously considered causation under the NSR program without ever mentioning proximate cause principles. *See DTE I*, 711 F.3d at 651-52. And, as the D.C. Circuit noted in evaluating the federal version of major modification regulations, EPA's view in promulgating that rule was that the fact that economic conditions may be a "proximate cause" of emissions increases should not excuse liability when there is still "a causal link between the proposed change and any post-change increase in emissions." *New York v. EPA*, 413 F.3d 3, 32 (D.C. Cir. 2005) (quoting 63 Fed. Reg. 39857, 39560 (July 24, 1998); 67 Fed. Reg. 80,186, 80,203 (Dec. 31, 2002)).

To be sure, some contexts warrant incorporating proximate cause principles (*see* Opening Br. 35) given that the concept is among the background principles against which Congress legislates. But a background principle like this does not overcome the statute's plain language or relevant structure. *See McGirt v. Oklahoma*, 591 U.S. 894, 915 (2020) ("There is no need to consult extratextual sources when the meaning of a statute's terms is clear. Nor may extratextual sources overcome those terms."). Unlike in *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132 (2014), cited by Defendants

(Opening Br. 35-38), there is no question about the scope of a private right of action here or any ambiguity about who Congress authorized to sue, because the provisions at issue here are about when a violation occurs, not when a right of action exists. There is simply no evidence that Congress intended to incorporate principles of proximate causation into the NSR provision when the text indicates the opposite.

Defendants also incorrectly rely (Opening Br. 35) on dicta about proximate causation in *Burrage*. In setting out general principles of culpability in criminal law, the Court noted that the law typically considers both "actual cause and legal cause" (otherwise known as but-for and proximate cause). 571 U.S. at 210. But *Burrage* was not interpreting the actual text of the relevant provision at that point; the Court was simply setting out background principles. *See id.* And though the Court granted certiorari on "two questions" that "roughly coincide" with but-for and proximate cause questions, it found "it necessary to decide only the first"—but-for causation. *See id.* In the very next paragraph, the Court expressly holds that the term "results from" means but-for causation—not proximate causation. *See id.* And unlike background criminal law concepts the Supreme Court noted in dicta in

*Burrage*, the NSR program requires no proof of intent or negligence. *See, e.g.*, *United States v. Anthony Dell'Aquilla, Enters. & Subsidiaries*, 150 F.3d 329, 332 (3d Cir. 1998).

In any event, proximate cause principles would not change the result here. When it applies, a "[p]roximate-cause analysis is controlled by the nature of the statutory cause of action," and the question "is whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits." *Lexmark*, 572 U.S. at 133. The NSR program exists to control air pollution from construction of stationary sources. And those provisions plainly contemplate that economic demands do not overcome causation absent narrow circumstances not present here. *See supra* pp.8, 38-40.; *see, e.g.*, *Lexmark*, 572 U.S. at 133 (holding in Lanham Act case that "the intervening step of consumer deception is not fatal to the showing of proximate causation required by the statute" because "all commercial injuries from false advertising are derivative of those suffered by consumers.").

* * *

There is no genuine dispute that permanently removing the COG limit resulted in significantly increased emissions, making it a major

modification. Defendants' contrary arguments rely on a thin evidentiary reed that does not create a genuine dispute about Defendants' intention to use (and, indeed, their actual use of) COG alone to operate their ovens. And Defendants' conceptions of but-for and proximate causation are legally unsound. This Court should affirm.

### B. The United States' claims were timely.

A claim for civil penalties for making a major modification without obtaining a permit must be brought "within five years from the date when the claim first accrued." 28 U.S.C. § 2462. The United States' claims are timely for three reasons: (1) its NSR claims first accrued under Michigan's SIP when emissions increased; (2) under this Court's interpretation of nearly identical SIP language, Michigan's SIP creates ongoing obligations; and (3) even under Defendants' statute of limitations theory, the United States' suit was timely filed.

#### 1. The United States' claims accrued when emissions increased.

The United States' claim under Michigan's SIP "first accrued" when emissions first increased above the major modification threshold in 2018. *See* 28 U.S.C. § 2462. Michigan's SIP provides that "[r]egardless of any . . . preconstruction projections, a major

modification results if the project causes a significant emissions increase and a significant net emissions increase." Mich. Admin. Code R. 336.2902(2)(b); *see also* Mich. Admin. Code R. 336.2802(4)(b). Under this provision, a "major modification" violation occurs once the emissions causing a major modification occur. *Id.*; *see id.* R. 336.2902(2). It is at this point that, "[r]egardless of any . . . preconstruction projections," *id.*, the source must secure an NSR permit. *See id.* It is only then that the United States "has a complete and present cause of action" and a "right to file suit and obtain relief." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 809 (2024) (cleaned up) (interpreting language similar to 28 U.S.C. § 2462).

In *DTE I*, this Court interpreted a federal regulatory provision that, like Michigan's SIP, considers emissions increases to result in a major modification "[r]egardless of any . . . preconstruction projections." § 52.21(a)(2)(iv)(B); *see DTE I*, 711 F.3d at 651. There, the Court concluded that this provision means that "EPA can bring an enforcement action whenever emissions increase, so long as the increase is traceable to the construction" project. *DTE I*, 711 F.3d at 651. It is not as clear as Defendants think (*see* Opening Br. 51-52) that this

language is dicta, but if it is merely persuasive authority for this point, it is correct. Under Michigan's SIP, the United States' claim that "a major modification result[ed]" from the permanent removal of the COG limit accrued when it "cause[d] a significant emissions increase," "[r]egardless of" Defendants' pre-construction projections. Mich. Admin. Code R. 336.2902(2)(b). Once those "projections [were] later proven incorrect, EPA c[ould] bring an enforcement action." *DTE I*, 711 F.3d at 651.

#### 2. Michigan's SIP imposes ongoing obligations and claims for noncompliance accrue anew each day.

Even ignoring the "regardless of" provision, Michigan's SIP separately imposes a continuing obligation to comply with BACT and LAER: "[a] major modification shall apply best available control technology" in attainment areas and "shall comply with the lowest achievable emissions rate" in nonattainment areas. Mich. Admin. Code R. 336.2810(3); Mich. Admin. Code R. 336.2908(3). And "[a]pproval to construct shall not relieve an owner or operator of the responsibility to comply fully with applicable provisions of the [SIP]." Mich. Admin. Code R. 336.2818(1); Mich. Admin. Code R. 336.2902(5)(a). Failing to comply

with these obligations is "actionable, and this cause of action manifests itself anew each day a plant operates without" complying. *National Parks*, 480 F.3d at 419.

This Court's decision in *National Parks Conservation Ass'n v. TVA* held that materially indistinguishable provisions in Tennessee's SIP create "ongoing obligation[s] to apply BACT" even after construction is completed. 480 F.3d at 418-19. Indeed, Michigan's Rule 336.2810(3) contains language nearly identical to Tennessee's SIP provision that this Court held "by its own terms, creates an ongoing obligation to apply BACT, regardless of what terms a preconstruction permit may or may not contain." *Id.* at 418. And, like the SIP provision at issue in *National Parks*, Michigan Rules 336.2818(1) and 336.2902(5)(a) direct that getting a permit does "not relieve an owner or operator of the responsibility to comply fully with applicable provisions under" the SIP, *id.* at 418; *see* Mich. Admin. Code R. 336.2818(1), 336.2902(5)(a). *National Parks* dictates that under provisions like this, "failing to apply BACT is actionable, and this cause of action manifests itself anew each day a plant operates without BACT limits on emissions." 480 F.3d at 419. That holding controls here.

Defendants assert (Opening Br. 39-52) that the United States' claims are untimely because the Clean Air Act imposes only "preconstruction permitting obligations, rather than ongoing operational requirements." Opening Br. 40. These arguments rest on a misunderstanding of the Clean Air Act and the Michigan SIP.

To begin, Defendants fail (Opening Br. 48-52) to distinguish this Court's decision in *National Parks*. Though it is true (Opening Br. 49) that Michigan's SIP does not include a provision that explicitly requires a post-construction permit, this Court separately concluded that SIP language like Michigan's makes "failing to apply BACT . . . actionable, and this cause of action manifests itself anew each day a plant operates without BACT limits on emissions." *Id.* at 419. That is the relevant holding here. And Defendants are simply wrong (Opening Br. 50) that "there is no comparable provision under Michigan law" to the "shall not relieve" provision in the Tennessee SIP. Michigan Rules 2818(1) and 2902(5)(a) contain this same language. Mich. Admin. Code R. 336.2818(1), 336.2902(5)(a).

Defendants' contrary arguments (Opening Br. 39-45) are based on an interpretation of 42 U.S.C. § 7475(a) and the "continuing violation"

doctrine, a theory distinct from a continuing failure to comply with ongoing obligations, *see Nat'l Parks*, 480 F.3d at 416 (explaining that the doctrine allows courts to "consider as timely all relevant violations including those that would otherwise be time-barred (cleaned up)). But this Court did not reach those issues in *National Parks* and need not here either under Michigan's functionally identical provisions. Though the district court characterized *National Parks* as creating a "continuing violation," MSJ Op., R.E.331, PageID#24354, that just refers to the Court's holding that the SIP language there created continuing NSR obligations actionable each day that a violation occurs. Michigan's SIP does the same, and this Court need not go further.

Defendants' remaining arguments fail. It does not matter what other circuits have said about Section 7475(a), *see* Opening Br. 40-44, because we rely on Michigan's SIP, not Section 7475. Indeed, several circuits have distinguished the relevant SIP language here from their decisions interpreting Section 7475(a) for exactly this reason. *See Nat'l Parks & Conservation Ass'n, Inc. v. TVA*, 502 F.3d 1316, 1324 (11th Cir. 2007) ("Were this case governed by Tennessee's environmental regulations, the Sixth Circuit's decision in *National Parks* indeed would

be persuasive authority"); *see also United States v. EME Homer City Generation, L.P.*, 727 F.3d 274, 290 (3d Cir. 2013); *United States v. Midwest Generation, LLC*, 720 F.3d 644, 647 (7th Cir. 2013); *Sierra Club v. Otter Tail Power Co.*, 615 F.3d 1008, 1017 (8th Cir. 2010). Contrary to Defendants' assertion (Opening Br. 47), the only circuit case interpreting language that is "functionally identical" to Michigan's SIP is this Court's decision in *National Parks*.

Finally, it was appropriate for the district court to rely on Michigan's SIP for the statute of limitations analysis, despite what Defendants imply (Opening Br. 45). As *National Parks* noted, emissions standards and limitations enforceable under the Clean Air Act include provisions "under any applicable State implementation plan approved by" EPA. 480 F.3d at 418. If Defendants are arguing that there is something wrong with Michigan's SIP, that kind of argument is "not . . . subject to judicial review in civil . . . proceedings for enforcement." 42 U.S.C. § 7607(b)(2); *see id.* § 7607(b)(1); *State of Wisconsin v. EPA*, 938 F.3d 303, 335 (D.C. Cir. 2019) (discussing bar on collateral attack to EPA's decision whether to adopt SIP).

### 3. The United States' claim is timely even under Defendants' theory.

Even under Defendants' theory, the United States' claim is timely if it accrued on or after September 1, 2014. Opening Br. 39. Yet the major modification at issue occurred—at the earliest—when EES Coke obtained the 2014 permit in *November* of 2014, which is after Defendants' own cutoff date. Permit, R.E.168-8, PageID#9372. The district court explicitly concluded on summary judgment that it was the 2014 permit's permanent removal of the COG limit that resulted in a major modification. MSJ Op., R.E.331, PageID#24347. Defendants' theory on appeal is that the United States' claims accrued only once—when the major modification occurred without a permit. Opening Br. 40-42. Although the United States disputes that premise, the United States' claims are timely even under Defendants' theory because the 2014 permit's permanent removal of the COG limit caused the major modification.

Defendants assume but never argue (*e.g.*, Opening Br. 21, 40) that the relevant change occurred (and thus the five-year limitations began to run) in 2013, when EGLE issued a temporary (not more than one year) reprieve from the COG limit. *See* Opening Br. 40 (asserting claims

accrued in 2013). But the United States contested that point in district court, arguing that the government's claims accrued at the earliest when the 2014 permit issued in November 2014. *See* MSJ Resp., R.E.203, PageID#15016-17, 15022. Although the district court did not explicitly address the accrual arguments, the court separately concluded that the 2014 permit resulted in a major modification and, in addressing the United States' reporting claim, concluded that the 2013 temporary permit and 2014 permit "are legally distinct instruments" based on separate applications and approvals, and "there was no assurance that the 2014 [p]ermit would be approved" based on the temporary reprieve. MSJ Op., R.E.331, PageID#24351.

Defendants' brief on appeal completely ignores this backdrop and simply assumes their earlier 2013 accrual date is correct. *See* Opening Br. 39-40. In effect, Defendants are asking this Court to sub silentio reverse the district court's determination about when the major modification occurred by simply assuming that Defendants are correct about the date of the change. Defendants never grapple with the basic differences between the temporary permit and the 2014 permit that permanently resulted in a major modification and included differing

terms, like removal of other emissions limits. *See supra* pp.42. Failing to brief the central premise of an appeal forfeits the issue. *See, e.g.*, *Williamson v. Recovery Ltd. P'ship*, 731 F.3d 608, 621 (6th Cir. 2013) ("Issues adverted to in a perfunctory manner, without some effort to develop an argument, are deemed forfeited."). Stripped of that premise, the United States' claims are timely under any theory of accrual because the 2014 permit issued within the limitations period, which Defendants say extends back to September 1, 2014. *See* Opening Br. 39.

### C. The district court correctly held Defendants liable for reporting violations on summary judgment.

Defendants assert (Opening Br. 52-54) that the district court erred in concluding on summary judgment that Defendants were liable for the United States' second claim—failure to provide reports under Mich. Admin. Code R. 336.2902(6), (6)(e). Defendants argue that they lacked fair notice of a potential violation. But Defendants argued at summary judgment only that a different version of reasonable possibility requirements applied. *See* MSJ. Resp., R.E.208, PageID#15124-27; MSJ Op., R.E.331, PageID#24350-52 (rejecting argument at summary judgment). Defendants never argued a lack of fair notice in combatting

liability below. *Id.* Once a similar argument was raised for trial, the district court took it into account when it imposed a penalty of just $1.00 for this violation. Tr. Op., R.E.410, PageID#28638. There is no reason to reverse on liability based on an argument Defendants did not raise at the time.

In any event, the EGLE memo Defendants rely on for their argument that they were told no reasonable possibility reporting was required, EGLE Memo, R.E.168-16, PageID#9889, does not override the plain language of Michigan's SIP provisions requiring report. And the memo is an internal analysis of Defendants' permit application, not an official, binding interpretation. Finally, there is no contention that Michigan's statements about compliance bind the United States, which has separate enforcement authority. 42 U.S.C. § 7413. The district court did not err in holding that the United States established liability for reasonable possibility reporting as a matter of law.

## II. The district court did not abuse its discretion or clearly err in its operator liability finding and in granting the United States' requested relief after trial.

Two issues went to trial in the district court: (1) whether the defendant parent companies are "operator[s]" liable under the Clean Air

Act; and (2) the appropriate remedy for the violations. Final Pretrial Order, R.E.372, PageID#25690-97. The district court did not clearly err in finding the defendant parent companies liable as operators and did not abuse its discretion in imposing a civil penalty of $100 million for Defendants' failure to secure a permit after making a major modification. Finally, Defendants are incorrect that the United States' request for injunctive relief is barred under the concurrent remedies doctrine.

### A. The district court did not clearly err in finding that all defendants are operators of the facility.

Under the Clean Air Act, EPA can enforce violations of SIP provisions against any "owner or operator of . . . a major stationary source." 42 U.S.C. § 7413(b). This includes "any person who owns, leases, operates, controls, or supervises a stationary source." *Id.* § 7411(a)(5). Under an analogous provision in the Comprehensive Environmental Response, Compensation, and Liability Act, the Supreme Court in *United States v. Bestfoods*, 524 U.S. 51, 62 (1998), adopted a fact-specific test that asks whether an entity managed, directed, or conducted operations related to pollution. "In the wake of *Bestfoods*, this Circuit adopted an 'actual control' test to help resolve

whether an entity is an operator." *Am. Premier Underwriters, Inc. v. Gen. Elec. Co.*, 14 F.4th 560, 574 (6th Cir. 2021). Under this "fact-intensive inquiry," "many factors may be useful," but this Court has "adopted no binding list of factors." *Id.* at 575.

After a two-week trial, the district court issued comprehensive factual findings determining that EES Coke's three parent companies—DTEES, DTEER, and DTEEC—"exhibit a high degree of control over the [f]acility, including over environmental decision-making and the [f]acility's emissions-related activities." Tr. Op., R.E.410, PageID#28616. Indeed, as the district court found, "EES Coke has no employees of its own," and everyone "involved in the management and operations of the [f]acility are employed by other companies." *Id.* Based on these fundamental observations and detailed findings about each parent company's activities, the district court concluded that each qualified as an "operator" of the facility under the Clean Air Act. *Id.* PageID#28631-32.

Defendants cannot show that these findings of fact were clearly erroneous, and they do not even try. Instead, even though Defendants make new factual arguments about certain employees' roles for the first

time on appeal (*see infra* pp.68-70), Defendants assert that de novo review applies here because "the relevant facts are undisputed." Opening Br. 55 n.7. But "[t]he appropriate standard of review for a mixed question depends 'on whether answering it entails primarily legal or factual work.'" *Bufkin v. Collins*, 604 U.S. 369, 381-82 (2025) (quoting *U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 583 U.S. 387, 396 (2018)). And a defendant's "operator status" is a "fact-intensive" mixed question of law and fact based on the "totality of the circumstances." *Am. Premier*, 14 F.4th at 569 (cleaned up). That kind of evaluation of evidence "is 'about as factual sounding' as any question gets." *Bufkin*, 604 U.S. at 370 (cleaned up); *U.S. Bank*, 583 U.S. at 397.

Nor did the district court clearly err in weighing the actual control test's factors, which consider "who directs the workings of, manages, or conducts the affairs" of a facility's operations related to pollution and who makes "decisions about compliance with environmental regulations." *Bestfoods*, 524 U.S. at 66-67. The district court catalogued the relationships between the various parent companies after finding that EES Coke itself has no employees and evaluated the extent to

which each parent company controlled environmental compliance and other operational decisions. Tr. Op., R.E.410, PageID#28627-32.

Defendants assert (Opening Br. 56-57) that DTEEC was "hardly involved at all," but the district court found otherwise after trial. Tr. Op., R.E.410, PageID#28631. As the district court noted, DTEEC holds *all of* EES Coke's cash. *Id.* PageID#28622, 30. Nowhere do Defendants explain how that fact is consistent with investor status. Opening Br. 56-57. Indeed, as the district court determined, that arrangement goes "well beyond" typical investor activities like monitoring performance, supervising budget decisions, and establishing general policies and procedures. *See Bestfoods*, 524 U.S. at 72.

Defendants have more to say about DTEER and DTEES, *see* Opening Br. 57-61, but none of their arguments result in "the definite and firm conviction that a mistake has been committed" required for clear error. *Max Trucking, LLC v. Liberty Mut. Ins. Corp.*, 802 F.3d 793, 808 (6th Cir. 2015).

The district court found that DTEES exercises exceptionally broad authority over day-to-day facility operations, including operations related to emissions, and that DTEES employees are responsible for

environmental compliance, permitting, and pollution controls—like a decision in 2015 not to install desulfurization technology. Tr. Op., R.E.410, PageID#28627-28. Plus, Dr. Michael Shafer, who is solely employed by DTEES and did not serve as an EES Coke officer, was also "responsible for developing EES Coke's coal blend, which is the [f]acility's primary mechanism for controlling the amount of [sulfur dioxide] emitted by the [f]acility." *Id.* PageID#28618-19, 28628. DTEER, DTEES's parent company, likewise actively participated in environmental decision making, including permitting, through its employees. *Id.* PageID#28629.

Defendants are wrong (Opening Br. 58-60) that the district court did not properly address certain employees' dual roles. The ordinary rule is that dual officers are presumed to be acting on behalf of the subsidiary. *Bestfoods*, 524 U.S. at 69-70, 70 n.13. But the strength of that presumption depends on whether their actions are "consistent with the norms of corporate behavior." *Bestfoods*, 524 U.S. at 70 n.13. The presumption "wanes as the distance from those accepted norms approaches the point of action by a dual officer plainly contrary to the interests of the subsidiary yet nonetheless advantageous to the parent."

*Id.* Defendants read this "contrary to the interests" language as the threshold for rebutting the dual-hat presumption, Opening Br.58-60, but *Bestfoods* is clear that actions should be evaluated on a spectrum between that extreme and normal corporate behavior. Here, the district court explicitly found that DTEES's and DTEER's level of involvement was "eccentric under accepted norms of parental oversight" and "well beyond what is consistent with a parent company's investor status." Tr. Op., R.E.410, PageID#28629-30. That is sufficient to rebut any dual-officer presumption.

In any event, there is no evidence that the employees Defendants discuss (Opening Br. 58) are actually dual officers. Defendants discuss only Ronald Burnette and Marion Krchmar, asserting for the first time that they were dual officers because they served as the facility's Plant Manager at various times. *See* Opening Br. 58. But the district court relied on Defendants' responses to interrogatories introduced at trial to conclude that both were employed solely by DTEES. PageID#28617-18. When identifying corporate directors and officers in its interrogatory responses, EES Coke did not list these two. Appx.104-05 (plaintiffs' exhibit 836, admitted at Tr., R.E.375, PageID#26106). That supports

the district court's finding that DTEES was deeply involved in day-to-day operations—its employees ran the plant while EES Coke had no employees (or cash) of its own. Tr. Op., PageID#28616, 28630.[7]

Even if Krchmar and Burnette were dual officers, Defendants concede that not all parent employees were. *See* Opening Br. 60. The district court relied on actions associated with environmental operations by many other parent employees that Defendants do not address at all. *See id.* 58-62; Tr. Op., R.E.410, PageID#28617-23. Nor does it matter (Opening Br. 60-61) that these other employees reported to Burnette. Even if Burnette was an EES Coke officer (he was not), Defendants cite no authority for the proposition that other employees' actions can be ignored simply because they were supervised at some level by a dual officer. Parent employees other than Burnette and Krchmar engaged with regulatory agencies and permitting processes, investigated desulfurization technology as a form of emissions reduction, and routinely made operational decisions about the facility. Tr. Op., R.E.410, PageID#28628-30, 28617-23. These findings

[7] Employees with titles like "manager" are not typically considered corporate officers, who traditionally hold titles like President, Secretary, Treasurer, and the like. *See* 3 Fletcher Cyc. Corp. § 837.50.

independently support the district court's determinations about corporate parent liability.

Finally, Defendants' arguments about the various management services agreements between DTEER, DTEES, and EES Coke (Opening Br. 61-62) are a red herring. The district court relied primarily on the actions of specific employees of parent companies who were not corporate officers of EES Coke. *See* Tr. Op., R.E.410, PageID#28620-22, 28627-30. Anyway, the question of whether a management services agreement is evidence of actual control depends on its terms. As the district court found, the agreements here essentially meant that the parent companies and their personnel did *everything* for the EES Coke facility, *id.* PageID#28617, 28620, 28627, 28629, not just general monitoring and control within the normal practices of a parent company, *see* Opening Br. 61 (citing *N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp.*, 766 F.3d 212, 223 (2d Cir. 2014)). Fairly read, the district court treated these agreements as one among many factors in evaluating the totality of the circumstances. *See Am. Premier*, 14 F.4th at 575. That was not clear error.

### B. The district court did not abuse its discretion in imposing a $100 million civil penalty for Defendants' principal NSR violation.

Civil penalties under the Clean Air Act are governed by 42 U.S.C. § 7413(e)(1). That provision lists seven factors courts "shall take into consideration" and such other factors that "justice may require." 42 U.S.C. § 7413(e); *see also B & W Inv. Props.*, 38 F.3d at 368. The listed statutory factors include "the size of the business, the economic impact of the penalty on the business," compliance history and good faith efforts, duration of a violation, previous penalties paid, "the economic benefit of noncompliance, and the seriousness of the violation." 42 U.S.C. § 7413(e)(1). This Court "review[s] the assessment of a civil penalty under an abuse of discretion standard." *United States v. Midwest Suspension & Brake*, 49 F.3d 1197, 1205 (6th Cir. 1995).

The district court first calculated the maximum statutory penalty for Defendants' NSR violation at $304,843,700. Tr. Op., R.E.410, PageID#28632. After weighing the competing evidence on the central factor of economic benefit, the court credited the United States' expert and used a mid-range economic benefit figure of $70 million as a "benchmark for Defendants' economic benefit of noncompliance." *Id.*

PageID#28637. The court separately found that a 1.5 multiplier to "level[] the economic playing field and adequately deter[] future Clean Air Act violations" and a $5 million reduction to account for Defendants' belief that "their excess emissions were lawful," were warranted. *Id.* PageID#28637-38.

The district court's penalty award was well within its discretion. Defendants are incorrect (Opening Br. 62-64) that the district court treated economic benefit as an immutable statutory minimum. Rather, the district court simply started with economic benefit, an approach that benefited Defendants given that the alternative calculation method starts from the statutory maximum of $304,843,700, Tr. Op., 410, PageID#28632—a number more than four times larger than the economic benefit figure. *See United States v. Mun. Auth. of Union Twp.*, 150 F.3d 259, 265 (3d Cir. 1998) (describing, in Clean Water Act case, "top down" approach that starts with the statutory maximum and adjusts downward and "bottom up" approach that starts with economic benefit).

That the district court found the economic benefit gained by virtue of the violation to be the most important factor is hardly surprising—

most courts do. *See, e.g.*, *Atl. States Legal Found., Inc. v. Tyson Foods, Inc.*, 897 F.2d 1128, 1141 (11th Cir. 1990) ("Insuring that violators do not reap economic benefit by failing to comply with the statutory mandate is of key importance if the penalties are to successfully to deter violations."). The district court's references to case law discussing economic benefit as a "floor" does not convert its exercise of discretion in weighing the relevant factors into some kind of mandatory minimum. Rather, in context, the court was simply indicating the importance of that factor to its analysis. *Contra* Opening Br. 63-64.

Next, Defendants assert (Opening Br. 64-65) that deterrence is irrelevant here because Defendants believed they were complying with the law. To start, whatever good faith belief Defendants had about their compliance ended when EPA sent EES Coke notices of violation in September 2020. Tr. Op., R.E.410, PageID#28634. But, as the district court explicitly found in determining that additional downward adjustments were unwarranted, Defendants "did not curtail the [f]acility's [sulfur dioxide] emissions" after that notice. *Id.* PageID#28638. Nor did Defendants ever take "steps to obtain the required NSR permits." *Id.* And Defendants are wrong (Opening Br. 64-

66) to rely on EGLE documents from 2014 as proof of good faith. Trial evidence (that Defendants ignore) established that although it did not join the United States' suit, EGLE "never formally objected to the notices of violation that EPA issued that led to this case" and "never objected to EPA filing a complaint." Tr., R.E.391, PageID#27377. Defendants' evidence does not speak to Defendants' intent once EPA sent a notice of violation, which is what the district court relied on in imposing the penalty it did.

The district court acted well within its discretion in issuing a civil penalty of $100 million for Defendants' NSR violation.

### C. The United States' request for injunctive relief is not barred.

Finally, the concurrent remedies doctrine does not bar the United States' request for injunctive relief. Under that doctrine, equitable relief can be withheld if a concurrent legal remedy is time-barred. But "the concurrent remedy doctrine does not apply to the government." *Sierra Club v. Okla. Gas and Elec. Co.*, 816 F.3d 666, 676 (10th Cir. 2016); *see also United States v. Banks,* 115 F.3d 916, 919 (11th Cir. 1997) ("[T]he concurrent remedy rule cannot properly be invoked against the government when it seeks equitable relief in its official enforcement

capacity."). What is more, Defendants never made this argument below. *See* EES Coke MSJ, R.E.168, 9267-69; Final Pretrial Order, R.E.372, PageID#25698-713. The district court thus properly issued an injunction requiring Defendants to comply with the NSR program. *See* Tr. Op., R.E.410, PageID#28640-41.

## CONCLUSION

For these reasons, this Court should affirm.

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*

/s/ Jacob D. Ecker
THOMAS A. BENSON
SASHA ALVARENGA
SAMANTHA RICCI
DANIEL HALAINEN
JACOB D. ECKER
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 532-3045
jacob.ecker@usdoj.gov

OF COUNSEL:

CHRISTOPHER GRUBB
JUSTIN BERCHIOLLI
Assistant Regional Counsel
U.S. EPA, Region 5
77 West Jackson Boulevard
Chicago, IL 60604

TERESA DYKES
Attorney Advisor
Office of Enforcement and Compliance Assurance
U.S. EPA
1200 Pennsylvania Avenue
Washington, DC 20460

August 24, 2026
90-5-2-1-09599/1

## CERTIFICATE OF COMPLIANCE

I hereby certify:

1. This document complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7) and this Court's June 22, 2026 Order because, excluding the parts of the document exempted by Rule 32(f), this document contains 13,966 words.

2. This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Century Schoolbook font.

*/s/ Jacob D. Ecker*
JACOB D. ECKER

Counsel for the United States

## CERTIFICATE OF SERVICE

I certify that on August 24, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit using the CM/ECF system. I also certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

*/s/ Jacob D. Ecker*
JACOB D. ECKER

Counsel for the United States

## ADDENDUM: DESIGNATION OF RELEVANT DOCUMENTS

Pursuant to 6 Cir. R. 30(g), the United States provides the following designation of relevant documents.

| District Court Docket Number | Description | Page ID # Range |
|---|---|---|
| 1 | Complaint | 1-22 |
| 9-2 | Galinsky Declaration | 98-129 |
| 38 | Order Granting Intervention | 2641-2643 |
| 77 | Motion to Amend Complaint | 3262-3289 |
| 90 | Order Granting Leave to Amend | 3784-3810 |
| 91 | Amended Complaint | 3811-3834 |
| 159 | U.S. Summary Judgment Motion and Statement of Material Facts | 5776-5810 |
| 159-5 | Burnette Letter | 5833-5838 |
| 159-11 | Responses to Interrogatories | 5886-5899 |
| 162 | Intervenors' Summary Judgment Motion | 5997-6021 |
| 168 | EES Coke Summary Judgment Motion | 9235-9270 |
| 168-3 | Mourad Declaration | 9276-9314 |
| 168-5 | Galinsky Declaration | 9335-9365 |
| 168-4 | Fanning Declaration | 9316-9332 |
| 168-8 | 2014 Permit | 9371-9409 |
| 168-9 | 2014 Permit Application | 9410-9629 |
| 168-10 | 2013 Temporary Permit Application | 9630-9850 |
| 168-16 | EGLE Memo | 9885-9898 |
| 169 | Parent Companies' Summary Judgment Motion | 9979-9983 |
| 203 | U.S. Response to Summary Judgment Motion | 14997-15024 |

| | | |
|---|---|---|
| 208 | Response to U.S. Summary Judgment Motion and Counterstatement of Material Facts | 15097-15128 |
| 228-1 | Defendants' Comments re: Permit | 16442-16445 |
| 261-1 | Campbell Expert Report | 17052-17107 |
| 262-15 | Responses to Interrogatories | 17407-17439 |
| 264-4 | Van der Poel Deposition | 17518-17537 |
| 264-7 | Rule 30(b)(6) Deposition | 17553-17556 |
| 286-2 | Rule 30(b)(6) Deposition | 20547-20556 |
| 331 | Summary Judgment Opinion and Order | 24325-24365 |
| 369 | Order Denying Interlocutory Appeal Certification | 25674-25683 |
| 372 | Joint Final Pretrial Order | 25688-25819 |
| 375 | Trial Transcript – Sept. 15, 2025 | 26084-26171 |
| 391 | Trial Transcript – Sept. 25, 2025 | 27363-27476 |
| 410 | Findings of Fact and Conclusions of Law | 28605-28656 |
| 412 | Judgment | 28659-63 |
| 418 | Notice of Appeal | 28718-20 |